2024 IL App (1st) 181933

No. 1-18-1933

Second Division
June 28, 2024

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

|  |  |  |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
|  | ) |  |
| Plaintiff-Appellee, | ) |  |
|  | ) | No. 13 CR 13349 |
| v. | ) |  |
|  | ) |  |
| ULYSSES POLK, | ) ) | Honorable Michael B. McHale, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE COBBS delivered the judgment of the court, with opinion.
Presiding Justice Howse and Justice Ellis concurred in the judgment and opinion.

**OPINION**

¶ 1     This case comes before us a result of a long and wide-sweeping investigation into the New Life Black Souls (NLBS) street gang in Chicago. The investigation culminated in nearly two dozen indictments under the Illinois Street Gang and Racketeer Influenced and Corrupt Organizations Law (RICO statute) (720 ILCS 5/art. 33G (West 2012)). Six alleged NLBS leaders—defendant Ulysses Polk and codefendants Antwan Davis, Cornel Dawson, Clifton Lemon, Teron Odum, and Duavon Spears—were indicted and tried jointly on one count of criminal drug conspiracy (720

ILCS 570/405.1(a) (West 2012)) and one count of racketeering conspiracy (720 ILCS 5/33G-4(a)(3) (West 2012)). The jury convicted each defendant on both counts. Polk was sentenced to three concurrent life sentences for racketeering conspiracy and a 40-year term for criminal drug conspiracy. Polk's codefendants received similar sentences. The defendants filed separate appeals, which this court consolidated under appeal No. 1-18-1491.[1] On February 2, 2022, we granted Polk's motion to sever his appeal from those of his codefendants. For the following reasons, we now remand the matter for further inquiry into allegations of juror misconduct and, if a new trial does not prove necessary, resentencing for criminal drug conspiracy only. Additionally, jurisdiction is retained.

¶ 2                                I. BACKGROUND

¶ 3      We recount the voluminous background of this case only to the extent necessary to resolve the issues presented on appeal. The facts are also set forth in codefendants' consolidated appeal. *People v. Spears*, 2024 IL App (1st) 181491.

¶ 4                            A. Conflict of Interest

¶ 5                              1. Attorney Becker

¶ 6      Polk was represented in the trial court by private attorney George Becker. Attorney Becker also represented Dawson, the leader of the NLBS and Polk's half-brother. Attorney Becker addressed the joint representation at a hearing on June 5, 2015, stating that he "explained to [Polk

---

[1]Only Polk is a party to this appeal. The appeals of Davis, Dawson, Lemon, and Spears remained consolidated under appeal No. 1-18-1491. Odum passed away in November 2021, and his appeal was consequently dismissed.

and Dawson] there's a potential conflict" because he "represent[ed] two people in the same conspiracy." Attorney Becker further explained that Polk and Dawson had signed a waiver form, which he tendered to the trial court. The signed form, entitled "Waiver of Potential Conflict of Interest," states that Polk "waives any potential conflict that George E. Becker may have in representing him in the above captioned matter based upon his current representation of Cornel Dawson, a codefendant in the same indictment." The trial court then asked attorney Becker whether he had analyzed the case for any potential antagonistic defenses between Polk and Dawson, to which attorney Becker replied, "Judge, I have, and I don't see any." Upon further questioning from the trial court, attorney Becker also denied that there was any "actual conflict of interest" that would "adversely affect [his] performance in this case in any way."

¶ 7     More than two years later, on June 19, 2017, attorney Becker raised the possibility of antagonistic defenses at a hearing on Polk and Dawson's motion to continue the trial date. Specifically, attorney Becker explained that the State would seek to introduce a witness's statement that Polk was at the scene shortly before the murder of Claude Snulligan. Because there was no evidence tying Dawson to the murder scene, attorney Becker stated he was unsure whether there he would have to "preclude [him]self from making the proper arguments on behalf of one [client] or the other." However, attorney Becker also stated that he had discussed the issue with his clients and that they both wished "to move forward with the waiver [of] conflicts that they previously signed." Even so, attorney Becker requested additional time to conduct further research

and file a motion to sever if necessary. The trial court responded that attorney Becker had had the statement in question "for years," but nevertheless gave him two weeks to file a motion to sever.

¶ 8    Attorney Becker filed a motion to sever Polk's case from those of his codefendants on June 30, 2017. The motion identified two bases for a severance: (1) the defenses of Polk and Dawson "may be antagonistic in that the State claims [Dawson] allegedly made a post-arrest statement admitting being a member of the Black Souls" and (2) "certain evidence may be introduced" against Polk's codefendants that "would be highly prejudicial and not probative or relevant to any charges against him."

¶ 9    The trial court denied the motion after a hearing, concluding that Dawson's own admission to being a Black Soul did not implicate Polk and did "rise to a level that requires severance."

¶ 10    On July 21, 2017, just one week after Polk's motion for severance was denied, attorney Dawn Projanksy was added to Polk's defense team. The motion to appoint attorney Projansky certified that she was a former public defender, was an experienced trial attorney, and had "no conflict of interest in representing any defendant." Attorney Projansky first appeared in court on Polk's behalf on August 11, 2017. Thereafter, she gave Polk's opening statement and cross-examined most of the State's witnesses, including the key witnesses relevant to the issues raised in this appeal. Attorney Becker delivered Polk's closing argument and litigated Polk and Dawson's joint motion for a new trial.

¶ 11                                    2. COH 1K

¶ 12     Also relevant to this appeal is a recorded conversation between Dawson and Alex Williams, the State's confidential informant, which came to be known as consensual overhear (COH) 1K. The conversation concerns Claude Snulligan, who had given the police incriminating statements about Odum, the NLBS' second-in-command. The evidence showed that Snulligan was later murdered by the NLBS in retaliation, which formed part of the basis for the racketeering conspiracy charge.

¶ 13     In COH 1K, Dawson explains to Williams that Snulligan was not seen for several months after incriminating Odum. Dawson goes on to state that, upon seeing Snulligan in the neighborhood again, he told his "brother" (whom Williams identified in court as Polk) to give him a gun in order to shoot Snulligan.[2] Polk insisted on accompanying Dawson, so the two followed Snulligan in Dawson's van. However, they did not confront Snulligan that day because they saw police in the area and suspected that he was "trying to set [them] up."

¶ 14     Through attorney Projanksy, Polk filed a pretrial motion regarding COH 1K. The motion itself is not in the record on appeal, but it is apparent that it concerned a potential conflict caused by Dawson's incriminating statements. At the hearing on the motion, attorney Projansky requested that the State agree not to introduce the statement at trial. The State refused, stating it "would not agree to eliminate that conversation. It's an integral part of the case." The State also argued that no severance was required because Polk and Dawson had already waived any conflict. Attorney

_____

[2]As previously noted, Dawson and Polk are half-brothers.

Becker then spoke up, asserting that Polk and Dawson signed the waiver "without knowing exactly what was said" in COH 1K.

¶ 15    The trial court denied Polk's motion, stating:

"I understand your point. So I looked at this and gave it some very sincere and thorough thought. Illinois case law states to show an actual conflict exists, a Defendant must point to some specific defect in his counsel's strategy, tactics or decision-making attributable to a conflict. Mere speculation and conclusory statements are not sufficient to establish an actual conflict. A Defendant must demonstrate that a conflict of interest would actually affect the adequacy of his representation.

I have already ruled that Mr. Dawson and Mr. Polk are members of the same conspiracy, so the statements come in through Alex Williams for both of them anyway. So I don't see any conflict at all here. Any attorney for Dawson is going to attack the credibility of Alex Williams, which is the same defense for Polk. There is no incentive for a different attorney to have any other different defense, which will be to attack the credibility of Alex Williams. There is no antagonistic defense here. There is no conflict. Motion is denied."

¶ 16                                    B. Jury Trial

¶ 17    The following evidence was adduced at defendants' jury trial.

¶ 18                            1. History of the Black Souls

¶ 19    Retired Chicago police detective John Rawski testified as the State's gang expert. He explained that in the 1990s, a gang known as the Impression Black Souls controlled the territory

from Pulaski Road to Keeler Avenue (east to west) and Madison Street to the Eisenhower Expressway (north to south). At that time, the leaders of the Impression Black Souls were Kevin Mitchell and Dwayne Lemon. The gang made money by selling drugs, primarily on Wilcox and Monroe Streets.

¶ 20    However, a "rift" in the mid-1990s caused some members, led by Dwayne Lemon, to break off and form a new faction called the New Life Black Souls. Dwayne Lemon remained in charge of the NLBS until he was murdered by the Impression Black Souls in 1999. Dawson, Dwayne Lemon's nephew, then became the leader of the NLBS shortly thereafter. Like the Impression Black Souls, the NLBS made money through a variety of crimes, including robbery, kidnapping, extortion, and drug sales.

¶ 21                              2. Polk's Membership and Rank within the NLBS

¶ 22    Detective Michael Lipsey testified as the State's expert in the field of narcotics law enforcement. He explained that the general structure of a typical drug trafficking enterprise consisted of suppliers, overseers, managers, pack runners, and street-level dealers. Overseers—or those who "actually run[ ] the drug operation"—receive drugs in bulk from suppliers and distribute to the mangers or those who "oversee the people out on the street selling drugs, [and make] sure that they're doing what they're supposed to do." Pack runners receive packs of drugs from the managers and distribute them to street-level dealers, who in turn sell them to customers on the street. Based on his investigation into the NLBS, Detective Lipsey opined that Polk held rank higher than street-level dealer.

¶ 23    Several former NLBS members and associates also testified to defendants' ranks within the NLBS. As relevant here, this evidence generally established that Dawson was the "chief" or leader of the NLBS by the early 2000s. As chief, Dawson gave orders, disciplined members, and oversaw day-to-day operations of the drug trade.

¶ 24    For example, Learies Brown, a former street-level dealer for the NLBS, gave a written statement to Assistant State's Attorney (ASA) Holly Kremin, detailing defendants' roles within the NLBS. According to Brown's statement, Dawson was "Chief" or "the head of the gang," who "always g[ot] a cut of the money when a person s[old] his drugs." Odum was "Commander" or the second in charge. Polk and Spears were pack runners who received drugs from Dawson and distributed them to sellers on the street. They would also collect money from the sellers and turn it in to Dawson. Specifically, Polk was "one of the top runners for the Black Souls" and "control[led] the 4100 block of Wilcox."

¶ 25    Jubali Stokes testified that he sold drugs for the NLBS in 2002. By that time, Dawson was Chief and the other defendants, including Polk, were all members.

¶ 26    Alex Williams testified as a paid confidential informant in the investigation. Williams became friends with Dawson in 1994, while they were both inmates in the Cook County jail. Williams was released from prison in 2002 and reunited with Dawson, who had become Chief of the NLBS. Williams met many other NLBS members, including Polk, through his relationship with Dawson. Williams believed that Polk was a member of the gang because he said he was a member, used gang signs, and was "addressed as a Black Soul."

¶ 27    Williams was arrested in 2004 and returned to prison until 2011. Upon his release, he again reconnected with Dawson, who was still Chief of the NLBS. From that time on, Williams became a confidential informant and spent much of his time hanging out in NLBS territory with Dawson and other members. During this stint, Williams extensively observed the NLBS drug trade. Williams testified that Polk was a "high-ranking member" of the gang who would pass out drugs and collect sale proceeds "[b]asically every day."

¶ 28                        3. "Predicate Activity" Murders

¶ 29    As part of the racketeering conspiracy charge, the State also presented the following evidence that the NLBS was responsible for the deaths of Claude Snulligan and Johnny Taylor, both of whom were murdered after the RICO statute took effect in June 2012.

¶ 30                        a. Murder of Claude Snulligan

¶ 31    The evidence showed that Snulligan, who lived in NLBS territory on West Monroe Street, openly complained about the NLBS selling drugs in the neighborhood. His complaints came to a head on April 3, 2012, when Odum and two other men confronted Snulligan at his house and accused him of calling the police on them. Odum demanded that Snulligan "make it up" to him by selling drugs for him. When Snulligan refused, Odum hit Snulligan with a gun and robbed him. Odum and the other men also tried to force Snulligan into the trunk of a car, but Snulligan was able to resist.

¶ 32    Odum was subsequently arrested for the attack. Shortly thereafter, Dawson reached out to Snulligan and offered to return the stolen property, pay him $3000, and "not mess with him

anymore" in exchange for Snulligan not cooperating in the case against Odum. Davis also encouraged Snulligan to meet with Odum's lawyer to sign an affidavit exonerating Odum. However, Snulligan did not accept Dawson's offer or sign the affidavit. Rather, Snulligan reported those conversations to the police.

¶ 33    On October 20, 2012, Snulligan and Lawrence Hale went to a cell phone store near Baba's Restaurant on Madison Street and Pulaski Road. Hale chatted with some friends in the parking lot, while Snulligan went inside the cell phone store. As Snulligan exited the store, Hale heard a gunshot and then saw Snulligan fall to the ground. Hale also saw the shooter running away from behind where Snulligan had been standing. However, Hale did not see the shooter's face and was able to describe him only as a Black man with dreadlocks and a gray hoodie pulled over his head.

¶ 34    Learies Brown testified that he did not observe anything about the shooting other than hearing the gunshot and seeing that Snulligan had been shot in the head. Detective Greg Swiderek, however, testified that Brown stated differently during an interview conducted on March 1, 2013. According to Detective Swiderek, Brown claimed that he saw Spears emerge from an alley off Madison Street and shoot Snulligan once in the back of the head. Spears was wearing a gray hoodie and pulled the hood over his head before firing the fatal shot. Spears then fled south on Pulaski Road toward Monroe Street.

¶ 35    Brown also gave a similar account of Snulligan's murder in his written statement to ASA Kremin on March 3, 2013. According to the statement, Brown saw Spears walk out of the alley as Snulligan was exiting the cell phone store. Spears was wearing a gray hoodie and had a "ponytail

and dreads." Spears pulled the hood over his head, shot Snulligan once in the head, and ran south on Pulaski Road.

¶ 36    Alex Williams testified that he was looking for a parking spot by Baba's Restaurant early in the afternoon on the day of Snulligan's murder. As Williams drove past the restaurant, he saw Polk and other NLBS members in the parking lot. Williams could not find a parking spot nearby, so he circled the block in search of one farther way. By the time he came back by Baba's parking lot, Snulligan was on the ground, shot.

¶ 37    Afterward, Williams called Dawson to report that he was at the scene and would "keep [his] eyes and ears to the street" to see if anybody was talking to the police about the shooting. Dawson replied only that it was "a good day in the hood."

¶ 38    Williams also viewed surveillance footage of Baba's parking lot in court. Among other NLBS members, Williams identified Polk, Davis, and Spears standing at the entrance to the parking lot at approximately 12:27 p.m. on the day of Sullivan's murder. Spears is wearing what appears to be a gray hoodie and blue jeans. Snulligan was shot approximately 15 minutes later.

¶ 39    On November 28, 2012, Williams secretly recorded a conversation between himself and Dawson. In that conversation, Williams mentions Spears and tells Dawson that he (Williams) witnessed Snulligan's shooting. Dawson explains that Spears had been charged with a drug crime, but not Snulligan's murder. Dawson also agrees with Williams' statement that Snulligan "had that coming," adding that Odum had been charged with battery, armed robbery, and attempted kidnapping based on what Snulligan had told the police. Dawson predicts that "they probably

throw that s*** out" now that Snulligan was "out [of] the picture." Finally, Dawson states that Snulligan crossed "[t]he wrong m***" and should have known better than to show up in the neighborhood after talking to the police.

¶ 40 Williams also recorded a conversation with Polk on December 11, 2012. In this conversation, Polk states that Spears was charged with a drug offense but was "good." Williams says that he was "right there" when Snulligan was killed and saw Polk, Davis, and Spears "in the lot puttin' it together and everything." Polk replies, "that's what's up" and states that Spears is "about that L." Williams testified that he understood Polk to mean that Spears was about the "street life" and willing to kill if necessary. Williams continues "I liked'd [*sic*] that. It was real quick, too. Real decent." Polk responds, "That how s*** work, man," which Williams understood to mean that the murder was the consequence of Snulligan being a "snitch."

¶ 41 In a third conversation, this time recorded on December 12, 2012, Williams tells Davis that he was surprised to see Snulligan on "Saturday on Madison at twelve thirty." Davis responds, "Naw, that s*** don't work like that there," which Williams understood to mean that Snulligan should not have been in the neighborhood after incriminating Odum. Williams continues that he "saw y'all put it together" and Spears "go straight across, whoop." Davis replies, "And handle his business," which Williams understood to mean that Spears "went across the street and killed Snulligan." Davis continues that Spears got "[o]ut the jam, too," meaning away from the murder scene, but had since been charged with a drug offense. Davis remarks that Spears was a "[t]wo

stars homie" for his actions, which Williams understood to mean that he had "done a good job by killing Snulligan."

¶ 42                                    b. Murder of Johnny Taylor

¶ 43    The State also presented evidence that unidentified NLBS members shot and killed Johnny Taylor, an aspiring rapper believed to be on the verge of signing a record deal with Atlantic Records. The State's theory was that Taylor, a member of the New Breeds street gang, was murdered in retaliation for the death of Darvelle Brown, who was shot and killed while selling drugs for the NLBS.

¶ 44    Marquette Robinson testified that, around midnight on January 9, 2013, he saw Johnny Taylor standing near an alley on South Springfield Avenue. Robinson acknowledged Taylor briefly and continued walking down the street. Robinson then heard multiple gunshots from behind him and ran away. When he returned to the area, he saw that Taylor had been shot.

¶ 45    In the hours after Taylor's murder, Detective Daniel Jensen viewed security footage from an apartment building next to the crime scene. However, the video did not capture the shooting itself, nor were the police able to ascertain the identity of anyone shown on the video. Nevertheless, a copy of the footage was taken into police custody.

¶ 46    Williams recorded a conversation with Dawson and Davis on the day after Taylor's murder. In the conversation, Davis approaches Dawson and states that "the little n*** they killed was a rapper" who was supposed to receive a $75,000 "signing bonus" on the following day. Davis goes on to explain that his girlfriend, an employee of "CTA Housing," had informed him that "the

cops just came and got the tapes." Davis claims that the police believed Taylor was killed in an attempted robbery for his bonus check.

¶ 47　Davis also states, presumably based on what he heard from his girlfriend, that the security footage did not show the perpetrators' faces when "they came down the alley" because they were wearing hoodies. However, according to Davis, the "front cameras" captured the shooters' faces as they went to leave the area. Davis speculates that the police would "[b]low the tape up" to identify the shooters. Dawson tells Davis to "[g]o tell them they need to sit down," which Williams testified meant to lay low and avoid police attention. Dawson also later states, "They better sit the f*** down. Take a nap. Everybody," which Williams understood to mean that all NLBS members should try to avoid police attention while the shooting was investigated.

¶ 48　About a week later, on January 18, 2013, Williams had another recorded conversation with Dawson and Davis. Davis states that the "little boy" from "[o]n Wilcox" had his funeral that day. Williams testified that this referred to Taylor, that "rapper that got killed on Springfield and Wilcox" while "selling drugs for the Souls."[3] Dawson replies that "[t]hey"—some people "over there on the corner"—were "nuts" for going to the funeral. "Williams testified that "they" referred to the NLBS members who killed Taylor. Davis adds, "So they family won't get suspicious" and, "For cops and s***." Williams testified that they were talking about the practice of "kill[ing] somebody and show[ing] up at they funeral and act[ing] like you ain't had s*** to do with it."

---

[3]As the record shows, Taylor was killed near the intersection of South Springfield Avenue and Wilcox Street.

¶ 49                                    4. Other Murders

¶ 50    The State also presented the following evidence that NLBS members were responsible for other murders that occurred prior to the effective date of the RICO statute.

¶ 51                              a. Murder of Charles Watson

¶ 52    The evidence showed that Charles Watson and Jubali Stokes sold drugs for the NLBS under Stokes's uncle, NLBS member William "Chuck" Redfield. On June 24, 2002, Redfield summoned Stokes and Watson to his house and accused them of stealing from the gang. Redfield and two other men then beat them with sticks, bound them with duct tape, forced them into a van, and drove them to an abandoned building near the intersection of Monroe Street and Pulaski Road.

¶ 53    Once at the abandoned building, Stokes was taken into basement while Watson was taken upstairs. Stokes testified that he saw Dawson, Clifton Lemon, Redfield, and Donald Hughes while in the basement. Stokes heard Watson screaming upstairs, but never saw him again after that. Stokes was eventually allowed to leave once it was determined that he had not stolen from the gang. Another member of the NLBS later dropped Stokes off at the hospital for the injuries he suffered during the beating at Redfield's house.

¶ 54    Hughes testified that he was on the street selling heroin for the NLBS that day when he saw Redfield's van drive into the area. Redfield got out and talked to Dawon and Clifton Lemon for a few minutes before leaving. Once Redfield drove away, Dawson told Hughes to remove some drugs that the NLBS had stashed inside the abandoned building. Hughes retrieved the drugs and hid them in a vacant lot across the street. On Dawson's orders, Hughes then "worked security," or

served as a lookout for police. Odum, Polk, and other NLBS members were also working security in the area at that time. When Redfield returned sometime later, he and others dragged Stokes out of the van and into the abandoned building.

¶ 55    Hughes went back into the building because he realized that he still had some drugs stashed there. Inside, he saw Dawson, Clifton Lemon, Stokes, and others in the basement. Hughes exited the building and continued working security.

¶ 56    Sometime later, Dawson and Clifton Lemon handed Hughes a shovel and told him to help a man named "Shaw" dig a hole by the abandoned building. Hughes and Shaw started digging the hole until someone yelled that the police were coming. Hughes ran from the area. Upon his return, he saw Redfield, Shaw, and another man throwing dirt over a body that had been placed in the hole. With the use of a cadaver dog, police later discovered Watson's body buried as Hughes described. Hughes was arrested and pled guilty to concealing a homicide.

¶ 57                              b. Murder of Earnest Keys

¶ 58    NLBS member Orlando Benamon testified that he attended a gang meeting in Garfield Park on July 25, 2003. Afterwards, he drove back to NLBS territory with Dawson and Odum. Along the way, Dawson pointed out a Chevy Impala that he believed was being driven by "Block," a member of a rival gang. The Impala then sped away.

¶ 59    Dawson instructed Benamon to "knock his s*** down" if the Impala returned, which Benamon understood as an order to kill the driver of the Impala. Benamon got out of the car at Pulaski Road and Monroe Street and kept watch for the Impala. Benamon saw the Impala return

to the area a while later. Around that time, Dawson also drove past and nodded his head to indicate "that that was the guy." When the Impala stopped at a stop sign, Benamon shot and killed the driver with the gun that Dawson had given him. Dawson later threatened to kill Benamon or a member of his family if he talked to the police about the shooting. The victim was later identified as Earnest Keys.[4]

¶ 60                                    5. Drug Evidence

¶ 61                                    a. Undercover Drug Buys

¶ 62     The State further presented evidence that the NLBS drug markets operated 24 hours a day, 7 days a week. Among this evidence were 23 undercover narcotics buys occurring in NLBS territory from April 2013 to June 2013. In addition to the testimony of various officers involved who executed these buys, the State presented video evidence of the operations recorded pursuant to consensual overhear orders.

¶ 63     For example, Officer Marcus Myles testified that from May 6 to June 5, 2013, he made five undercover heroin purchases from an apartment building located in the 4100 block of West Wilcox Street. On three of these occasions, Bobby Scott was one of the individuals who sold heroin to Officer Myles. On June 13, 2013, the police returned to the apartment building to execute an arrest warrant for Scott. Officers entered Scott's apartment, but he was not home. However, the

_____

[4]The evidence showed that Keys was murdered in a tragic case of mistaken identity. He was not the rival gang member called "Block," as Dawson believed.

officers recovered 263.4 grams of heroin in a bag on the living room coffee table. Scott was later arrested by different officers.

¶ 64                                    b. COH 2A

¶ 65    Many of the conversations secretly recorded by Williams also concerned the NLBS's drug trafficking operation. Of particular relevance here is COH 2A, a conversation between Polk and Williams from December 11, 2012. In that conversation, Williams tells Polk that he knew some people who "want[ed] to hustle," or sell drugs for the gang. Polk responds that he "really need[ed] somebody out here at night" because he only had "like two workers." When Williams asks for more details, Polk explains that, "[I]t's fourteen on the rocks." He continues, "Like every jab they finish turnin' one ten" and "you get $40 off the m***." Williams testified this meant that the worker would sell 14 bags of crack cocaine for a total of $110, and would get to keep $40 of the proceeds. Polk goes on to say that, "[A]fter I finish these jabs *** I'm going back to straight nickels. Then you get twenty-five off that jab." Williams explained that this meant that the worker would sell $5 bags of crack cocaine and keep $25 for every pack sold. Polk also continues to lament his staffing issues, stating that they "got to be consistent" and "have a m*** out here [the customers] see everyday and they know that they there."

¶ 66                              c. Defendants' Arrest

¶ 67    Spears was arrested on October 24, 2012, after selling two bags of crack cocaine to an undercover officer. All other defendants were arrested on June 13, 2013, upon the execution of separate arrest warrants.

¶ 68 Officer Kevin Kilroy testified that he participated in Polk's arrest. Officer Kilroy recovered small plastic bags, a grinder, and Dormin, a kind of pill commonly used to cut narcotics, from the closet in Polk's bedroom. Another member of the arrest team, Sergeant Jose Lopez, also discovered $1900 in cash, a digital scale, additional small plastic bags, and 48.6 grams of crack cocaine in Polk's home.

¶ 69                                    C. Jury Deliberations

¶ 70                                    1. Initial Jury Notes

¶ 71 On November 30, 2017, the third day of jury deliberations, the trial court received a note from jurors 120 (the foreperson) and 40 concerning potential juror misconduct. In particular, the note alleged that (1) juror 28 revealed that her father and brother were members of the Black Souls, (2) jurors 215 and 44 stated that they were "only here to send a message," and (3) juror 143 had engaged in "racially bullying" and "male chauvinism." Jurors 120 and 40 wrote that, "Due to the comments of personal statements and information that has come to light, we feel as though if not addressed, there will be a hung jury, and we do not want to continue on under these circumstances of bias."

¶ 72 Before the court could respond, it received another note, signed by juror 120, seeking "clarification" as to whether "a death that occurred in 2002 [could] be considered as a predicate activity for racketeering." The court set this note aside, stating it would first address the initial note.

¶ 73                                  a. Juror 28

¶ 74     As part of its inquiry into juror 120 and 40's claims of bias, the trial court first questioned juror 120. Juror 120 confirmed that "[j]uror No. 28 stated her father and brothers are members of the Black Souls." The court then questioned juror 28, who denied the allegation and explained that she was only illustrating the point that, "for example, if my father is a Black Soul, that doesn't make me a Black Soul." However, juror 28 also admitted that her brothers were members of a different gang, the Vice Lords. The State moved to dismiss juror 28 from the jury for being untruthful during *voir dire*, specifically when she denied that "any member of [her] immediate family" had "ever been involved in a gang." The court removed juror 28 over the defendants' objections and ordered the jury to stop deliberating.

¶ 75                                  b. Juror 215

¶ 76     Next, the court recalled juror 120 to discuss her allegations against juror 215. Juror 120 reiterated that juror 215 said something to the effect of "that he was going to send a message." The court questioned juror 215, who confirmed that he spoke of "sending a message" during deliberations. However, he also assured the court that he could "still apply the evidence in this case to the law and in that way decide the case and be fair to both sides." The court did not remove juror 215 from the jury.

¶ 77                                  c. Juror 143

¶ 78     The court then questioned juror 120 on her allegations of "racial bullying" and "male chauvinism" against juror 143. Juror 120 could not remember any of juror 143's exact words, but

claimed that he had "consistently been making racial comments" and, to a lesser extent, chauvinistic comments during deliberations. The court removed juror 143 without questioning him, stating that it found juror 120 credible and would not credit juror 143's denials because he had been a "terribly high-maintenance juror" and made it "very clear he doesn't want to be here."

¶ 79                                    d. Juror 44

¶ 80    The court then questioned juror 120 a final time about her allegation that juror 44 also mentioned "sending a message." Juror 120 could not remember his exact words, but recalled that they were "[n]ot racial" and "[b]ascially insinuate[ed] the same goal in trying to send a message." Juror 44 denied saying anything about "sending a message" and reiterated that he could be fair to all parties and apply the evidence to the law. The court did not remove juror 44. Two alternates were called in to replace jurors 28 and 143.

¶ 81                                    e. Juror 34

¶ 82    Later that day, before the new jury could be constituted, juror 34 suffered a medical episode in which she lost consciousness. She was taken to the hospital via ambulance. The court dismissed juror 34 *sua sponte* and called in another alternate.

¶ 83                              2. Subsequent Jury Notes

¶ 84    Around the time of juror 34's incident, the trial court received another note signed by jurors 120 and 40. This note stated, "Juror No. 40 would like to know your response on her request of being removed from the jury." After discussing the matter with the parties, the court responded

that juror 40 had not made such a request. Shortly thereafter, jurors 120 and 40 sent another note stating:

"Juror[s] 40 and 120 would like to be removed due to a letter received earlier today. With the instructions given to us in part of completing our civic duty, we personally feel the instructions are structured in a style to come to one verdict, and we can't complete our civic duty due to that."

¶ 85     The court removed jurors 120 and 40 *sua sponte*, stating that their emphasis on the instructions made it "obvious to this Court that what they are saying is [they] cannot follow the law." The defense objected, contending that the court should question jurors 120 and 40 before dismissing them. The State agreed, arguing that it would be "imprudent" to dismiss the jurors without further *voir dire*. However, the court declined the parties' requests for further *voir dire*, and replaced jurors 120 and 40 with alternates. The court informed the jury that they now "constitute[d] a new jury" and would "need to start over with deliberations *** from square one."

¶ 86                                             D. The Verdicts

¶ 87     On December 2, 2017, following three days of deliberations, the new jury found all defendants guilty of racketeering conspiracy and criminal drug conspiracy. For each defendant, the jury also made special findings that the murders of Snulligan and Taylor formed part of the predicate activity involved in the racketeering conspiracy. The jury further found that the unlawful deaths of Watson and Snulligan were reasonably foreseeable to Polk and occurred while Polk was otherwise engaged in the racketeering conspiracy.

¶ 88    Finally, the jury specially found that the following acts were proven to have been committed by a coconspirator in furtherance of the defendants' criminal drug conspiracy: (1) Frank Wynee's possession of 17.8 grams of cocaine with intent to deliver on March 29, 2013; (2) Dawson and Briel Elverton's possession of 26.6 grams of heroin with the intent to deliver on May 30, 2013; (3) Rickey Ceasar's possession of 17.3 grams of heroin with the intent to deliver on June 4, 2013; (4) Dawson's possession of 7.3 grams of heroin with the intent to deliver on June 13, 2013; (5) Bobby Scott's possession of 263.4 grams of heroin with the intent to deliver on June 13, 2013; and (6) Polk's possession of 48.6 grams of cocaine with the intent to deliver on June 13, 2013.

¶ 89                    E. Motion to Interview Juror 40

¶ 90    After the verdicts were read and the jury was polled, counsel for Odum requested permission to have an investigator speak with the juror who "said he wanted to send a message." In response, the State requested that the parties be "barred from contacting any member of the venire," including the jurors previously dismissed by the court. The court granted the State's oral motion, stating:

> "I am ordering all attorneys as follows: no one, without leave of Court, will be sending investigators to talk to any of these jurors. Do not do it. Do not do it. You will be in violation of a Court Order. Don't do it without bringing some sort of motion. Don't do it. All right. That's the Order."

¶ 91    Several months later, on April 6, 2018, defendants presented a joint "Motion for Leave of Court to Obtain a Sworn Affidavit of Juror [40] for Purpose[s] of Evaluating Factual Assertions

of Racial Bias."[5] Attached to the motion was an affidavit from Antwan Davis's sister, Shira Davis, dated March 22, 2018. In the affidavit, Shira explained that she contacted State Representative La Shawn K. Ford after the trial because she felt that the RICO statute was "unfair" and hoped Representative Ford could help repeal it. Representative Ford informed Shira that he had previously spoken to juror 40 and that juror 40 "felt the jury deliberations process was very unfair." After speaking to Representative Ford, Shira was able to contact juror 40 online because she was a "community activist with a high-profile Internet presence."

¶ 92       After initially communicating through Facebook, juror 40 gave Shira her phone number and asked to speak to her about the case. According to Shira's account of the phone call, juror 40 stated that the jury was split nine (whom juror 40 referred to as "they") to three (whom juror 40 referred to as "us") at the time juror 40 was dismissed. Juror 40 claimed that some of the nine "were jumping on tables, and throwing chairs." Shira asked juror 40, who is Black, whether "there was a lot of racism going on there," to which juror 40 simply answered "[y]es." Shira then asked whether " 'they' were calling you the 'n word,' " and juror 40 replied, "yes, they were calling us every name but the child of God." Finally, Shira claimed that juror 40 stated she "was hoping she could tell her story to someone" and "was willing to speak with the defense lawyers or defense investigators about what occurred during jury deliberations."

---

[5]The motion erroneously identified juror 40 as juror 38. There is no dispute that the motion pertained to juror 40.

¶ 93    The trial court denied the defense's motion, invoking the "no impeachment rule." The court recognized that in *Pena-Rodriguez v. Colorado*, 580 U.S. 206 (2017), upon which defendants relied, the United States Supreme Court established a limited exception to the "no impeachment rule" where there is a clear indication that a conviction was based on a juror's racial animus. However, the court distinguished *Pena-Rodriguez* on several bases, including that (1) juror 40 was not a member of the jury that convicted defendants and (2) Shira's affidavit did not contain the kind of detailed allegations of a racially-motivated verdict present in *Pena-Rodriguez*. The court also observed that juror 120 was "extremely diligent in reporting any perceived improprieties" and yet only raised a concern of racial bias from juror 143, who was dismissed. The court further stated that it would not find juror 40 credible because she "twice violated her oath to follow the law when she signed the note saying that she didn't agree with it, and she wasn't going to follow it."

¶ 94    Approximately one month later, on May 18, 2018, attorney Becker informed the court that juror 40 approached him at the courthouse that morning and wanted to speak to him. The court denied attorney Becker permission to speak to juror 40, reiterating that she lacked credibility.

¶ 95                    F. Defendants' Posttrial Motions

¶ 96    Also on May 18, 2018, the court held an extensive hearing on defendants' motions for a new trial. As relevant here, defendants argued that the court erred in removing jurors 120 and 40. The court rejected that argument, stating that those jurors' final note was "unequivocal that they were not going to follow the law" and were "placing their personal disagreement with the jury instructions over their oath to follow the law." The court further opined that "[t]here would have

been no point in questioning them after such an unequivocal written statement" and that it "had no confidence whatsoever in any attempt to rehabilitate them simply by telling them that the jury instructions are the law even if you think they're unfair." Accordingly, the court denied defendants' motions for a new trial.

¶ 97                                   G. Sentencing

¶ 98    The court held a sentencing hearing on June 1, 2018. After hearing arguments from the parties, the court made the following findings.

¶ 99    First, the court noted that section 33G-5 of the RICO statute (720 ILCS 5/33G-5 (West 2012)) required that a defendant be sentenced for racketeering conspiracy, according to the penalty associated with the conspiracy's predicate activity, if that penalty is greater than 30 years in prison. Because the jury found that the predicate activity for each defendant in this case included the murders of Snulligan and Taylor, the court concluded that it was required to impose a life sentence for each defendant. See 730 ILCS 5/5-8-1(a)(1)(c)(ii) (West 2012) (requiring a life sentence for a nonjuvenile defendant who murders more than one victim).

¶ 100   Second, the court observed that section 33G-5(c) of the RICO statute also required it to impose "an enhanced term" of 25 years to life for any reasonably foreseeable unlawful deaths found to have occurred while the defendant was otherwise engaged in the racketeering conspiracy. The court therefore imposed an additional life sentence for each reasonably foreseeable death found by the jury, *i.e.*, Polk was assessed two additional life sentences based on the reasonably foreseeable deaths of Snulligan and Taylor.

¶ 101   Third, and finally, the court sentenced Polk to 40 years in prison for criminal drug conspiracy, which was to be served consecutively to his concurrent life sentences for racketeering conspiracy. In imposing this sentence, the court opined that "a consecutive sentence is necessary to protect the public from further criminal conduct" by Polk.

¶ 102   Polk filed a motion to reconsider his sentence, which the court denied.

¶ 103   This appeal followed.

¶ 104                               II. ANALYSIS

¶ 105   At the outset, we note that the vast majority of arguments Polk raises on appeal are identical to those raised in his codefendants' consolidated appeal. See *Spears*, 2024 IL App (1st) 181491. For the sake of completeness, we will address those arguments again here. However, as the arguments are the same, we resolve them in the same way.

¶ 106                     A. Right to Unanimous Jury

¶ 107                     1. Dismissal of Jurors 120 and 40

¶ 108   We first address Polk's argument that he was denied his rights to a fair trial and a unanimous jury when the trial court dismissed jurors 120 and 40 after the start of deliberations.

¶ 109   Matters of jury selection and management are reserved to the sound discretion of the trial court. *People v. Roberts*, 214 Ill. 2d 106, 121 (2005). It is generally within the trial court's discretion to dismiss a jury even after deliberations have begun. *Id.* The "primary consideration" in deciding whether a trial court abused its discretion by removing a juror is the potential prejudice

to the defendant. *Id.* When evaluating the prejudicial impact of a juror's dismissal, a reviewing court considers the totality of the circumstances, including factors such as:

"(1) whether the alternate juror and the remaining original jurors were exposed to outside prejudicial influences about the case; (2) whether the original jurors had formed opinions about the case in the absence of the alternate juror; (3) whether the reconstituted jury was instructed to begin deliberations anew; (4) whether there is any indication that the jury failed to follow the court's instructions; and (5) the length of deliberations both before and after the substitution." *Id.* at 124.

¶ 110    Additionally, both the Illinois and United States Constitutions guarantee every criminal defendant the right to have his case decided by a unanimous verdict from 12 impartial jurors. U.S. Const. amend. VI; Ill. Const. 1970, art. I, § 13. This means a juror cannot be removed simply because they are not persuaded by the State's evidence. *United States v. Litwin*, 972 F.3d 1155, 1169 (9th Cir. 2020). Otherwise, the State could obtain a conviction, even though one or more members of the jury that began deliberations believed that the State had failed to prove its case. *United States v. Brown*, 823 F.2d 591, 596 (D.C. Cir. 1987). A trial court's discretion to dismiss a juror is therefore limited where the reason for dismissal stems from the juror's view on the sufficiency of the evidence. *United States v. Symington*, 195 F.3d 1080, 1085 (9th Cir. 1999).

¶ 111    Courts have recognized that a trial court faces "special challenges" in evaluating whether a juror's request to be dismissed stems from the juror's opinion on the evidence. *Id.* at 1086. This is because the reasons for a juror's request will often be unclear, and "a court may not delve deeply

into a juror's motivations because it may not intrude on the secrecy of the jury's deliberations." *Brown*, 823 F.2d at 596. Even where a trial court is faced with a juror's request to be removed, maintaining the secrecy of jury deliberations remains paramount, as "[i]t is beyond question that the secrecy of deliberations is critical to the success of the jury system." *United States v. Boone*, 458 F.3d 321, 329 (3d Cir. 2006). The secrecy of deliberations protects the jury from improper outside influences, facilitates open discussion among the jurors, and limits public scrutiny that might otherwise undermine the integrity of the deliberative process. *Symington*, 195 F.3d at 1086. On the other hand, the court must bear in mind that the defendant's right to a unanimous verdict from an impartial jury remains a fundamental constitutional right. *People v. Jackson*, 2022 IL 127256, ¶¶ 51, 63.

¶ 112 To navigate this thorny situation, the United States Court of Appeals, District of Columbia Circuit held in *Brown* that "if the record evidence discloses any possibility that the request to discharge stems from the juror's view of the sufficiency of the government's evidence, the court must deny the request." *Brown*, 823 F.2d at 596. According to the *Brown* court, "[a]ny other holding would fail to protect adequately a defendant's right to be convicted only by a unanimous jury." *Id.* Citing *Brown*, several federal courts of appeals have endorsed a similar rule, usually clarifying that there must not be any *reasonable* possibility that the juror was dismissed based on his view of the evidence. See, *e.g.*, *United States v. Kemp*, 500 F.3d 257, 303 (3d Cir. 2007); *Symington*, 195 F.3d at 1087; *United States v. Thomas*, 116 F.3d 606, 622 (2d Cir. 1997).

¶ 113  For example, in *Symington,* the United States Court of Appeals for the Ninth Circuit articulated the test as "if the record evidence discloses any *reasonable* possibility that the impetus for a juror's dismissal stems from the juror's view on the merits of the case, the court must not dismiss the juror." (Emphasis in original.) *Symington*, 195 F.3d at 1087. If the trial court determines that there is a reasonable possibility that the juror requested dismissal based on his dissatisfaction with the evidence, the court must either instruct the jury to continue deliberating or declare a mistrial. *Id.* Like *Brown*, the *Symington* court concluded that this standard was appropriate to balance the "twin imperatives" of preserving jury secrecy and protecting the defendant's right to a unanimous verdict. *Id.*

¶ 114  In *People v. Gallano*, 354 Ill. App. 3d 941, 954 (2004), this court adopted the *Symington* standard, holding that "where the record shows any reasonable possibility that the impetus for a juror's dismissal during deliberations stems from his views regarding the sufficiency of the evidence, the dismissal of that juror constitutes error." In line with federal cases discussed above, we agree with the *Gallano* court that this standard "ensures that a defendant's constitutional right to a unanimous jury verdict is protected" because it "guarantees that a juror will not be excused in a manner that appears to facilitate or manipulate the rendering of a guilty verdict." *Id.*

¶ 115  Thus, the question becomes whether there is a reasonable possibility that jurors 120 and 40 requested to be removed from the jury because of their dissatisfaction with the State's evidence. The State contends that the final note from jurors 120 and 40 was not about the evidence, but was instead a clear statement that they would not follow the law because they disagreed with

"structure" of the court's instructions. On the other hand, Polk asserts that jurors 120 and 40 "vacillated within the note as to why they thought they should be removed from the jury" and that the note did not unequivocally state that they would not follow the law. Polk concludes that the note is "ambiguous" because, although it could be interpreted as a refusal to follow the law, it could also be read as a statement that different factions of the jury disagreed about the proper way to interpret the court's instructions. As evidence that the jury was confused about the instructions, Polk notes that the jury sought clarification from the trial court as to whether a death from 2002 could constitute predicate activity.

¶ 116    The final note from jurors 120 and 40 is just two sentences and reads as follows:

"Juror 40 and 120 would like to be removed due to a letter received earlier today. With the instructions given to us as part of completing our civic duty, we personally feel the instructions are structured in a style to come to one verdict, and we can't complete our civic duty due to that."

¶ 117    As Polk appears to concede, the first sentence's mention of "a letter received earlier today" is clearly a reference to the trial court's prior correspondence with the jury. As detailed above, the court had received a jury note earlier that day asking if it had decided on juror 40's request to be dismissed. After consulting with the parties, the court responded that no such request had been made. Predictably, the court soon received another note in which juror 40 (and now juror 120) explicitly asked to be dismissed. In the second (and final) sentence of the note, jurors 120 and 40 explain that they wished to be dismissed because they "personally feel the instructions are

structured in a style to come to one verdict, and [they] can't complete [their] civic duty due to that."

¶ 118   We agree with the trial court that the only reasonable interpretation of this statement is that jurors 120 and 40 would not follow the law as instructed. Contrary to Polk's theories, nothing in the text of the note suggests that the request to be removed stemmed from confusion over the meaning of the instructions. Although Polk points out that the jury had also separately asked a question about the meaning of predicate activity, there is no indication that this straightforward legal question was a factor in the request for dismissal, especially where jurors 120 and 40 did not wait for the court to respond before asking to be removed.

¶ 119   Importantly, the final note from jurors 120 and 40 did not mention the evidence in any way. Rather, they asked to be dismissed because they felt that the *instructions* were "structured" such that they were forced to come to a particular verdict. Thus, their note strongly implies that they understood how to apply the evidence to the instructions, but for some reason did not want to do so.

¶ 120   This focus on the instructions, rather than the evidence, is what distinguishes the present case from *Brown*, on which Polk heavily relies. In *Brown*, the jury had deliberated for approximately five weeks when one of the jurors, juror Spriggs, sent the trial court a note stating that he was " 'not able to discharge [his] duties as a member of this jury.' " *Brown*, 823 F.2d at 594. The trial court questioned juror Spriggs, who expressed concerns with " 'the way [the federal RICO statute is] written *and* the way the evidence has been presented.' " (Emphasis in original.)

*Id.* at 597. Juror Spriggs also explained that, " '[had] the evidence [been] presented in a fashion in which the law is written, then, maybe, [he] would be able to discharge [his] duties.' " *Id.* Based on these statements, the *Brown* court determined that there was a "likelihood" that juror Spriggs requested to be removed because he believed that the evidence was inadequate to support a conviction. *Id.*

¶ 121   Here, by contrast, jurors 120 and 40 did not mention the evidence in any way. Rather, they focused solely on the instructions. However, jurors must, of course, follow the law as instructed, even if they may personally disagree with it. Indeed, jurors 120 and 40 both took an oath to do so in this case. We therefore cannot say that the trial court abused its discretion by removing those jurors when they refused to uphold their oath.

¶ 122                                    2. Dismissal of Juror 28

¶ 123   Polk also contends that the trial court erred in dismissing juror 28. Polk asserts that juror 28 was dismissed only after she revealed herself to be "defense-leaning" by stating that a person's gang membership does not mean that that person's relatives are also in the gang. Thus, Polk concludes that the trial court abused its discretion by removing juror 28, based on her view of the evidence.

¶ 124   However, the record demonstrates that juror 28 was dismissed not for her views on the evidence, but for being untruthful during *voir dire*. Specifically, juror 28 was selected for the jury in part because she answered "no" to the question, "Has any member of your immediate family or

very close friend ever been involved in a gang?" Yet, when later questioned by the trial court, juror 28 admitted that her brothers were members of the Vice Lords.

¶ 125    Polk does not dispute that, as a general matter, deliberate untruthfulness during *voir dire* is grounds for removal. See *United States v. Delva*, 858 F.3d 135, 158 (2d Cir. 2017); *United States v. Perkins*, 748 F.2d 1519, 1533 (11th Cir. 1984). Rather, Polk argues that juror 28 did not "lie" on her jury questionnaire, but was merely inadvertently untruthful. Polk submits that juror 28 could have been referring to her half-brothers or that there were some other circumstances such that she did not consider them to be "immediate family." He also theorizes that because a different question on the jury questionnaire named the Black Souls specifically, juror 28 could have assumed that all gang-related questions pertained only to that particular gang.

¶ 126    However,

> "[t]he veracity of those who testify during *voir dire* is a matter lying solely within the sound discretion of the [trial] court, and the decision to excuse a potential juror because of a reasonable belief that that person has been untruthful under oath is a question best left with that court." *People v. Williams*, 164 Ill. 2d 1, 17 (1994).

This is so because the trial court, having observed the jurors firsthand, is in a superior position to evaluate their credibility. *People v. Adkins*, 239 Ill. 2d 1, 21 (2010).

¶ 127    We cannot say that the trial court's assessment of juror 28's credibility was unreasonable in this case. Although Polk submits several theories as to why juror 28 might not have considered her brothers "immediate family," his theories are mere speculation. We also find it unlikely that

juror 28 mistakenly believed the question pertained only to the Black Souls where (1) the text of the question asked about "a gang" generally and (2) the only reference to the Black Souls was in the question *after* the one juror 28 answered falsely. Accordingly, the trial court did not abuse its discretion in removing juror 28.

¶ 128                                3. Motion to Interview Juror 40

¶ 129   Polk further contends that the trial court abused its discretion by denying him and his codefendants an opportunity to interview juror 40 about the allegations of racial animus raised in the affidavit from Davis's sister.

¶ 130    As a general rule, the testimony of a juror may not be used to impeach a jury's verdict after the trial. *People v. Pitsonbarger*, 205 Ill. 2d 444, 468 (2002). "It is well settled that a statement by a juror taken after the jury has rendered its verdict, has been polled in open court, and has been discharged will not be admitted to impeach the jury's verdict." *People v. Hobley*, 182 Ill. 2d 404, 457 (1998). This rule against the impeachment of a verdict is supported by "[s]trong public policy considerations," such as promoting finality, protecting jurors from harassment, and preserving the integrity of private deliberations. *People v. Williams*, 209 Ill. 2d 227, 239 (2004).

¶ 131   However, the "no impeachment" rule is not absolute. *Hobley*, 182 Ill. 2d at 457-58 (juror's affidavit admissible to show jury was exposed to improper outside influences). For example, in *Pena-Rodriguez*, 580 U.S. at 225, the United States Supreme Court recognized a narrow exception to the no impeachment rule for evidence that the verdict was motivated by racial bias. There, the petitioner was convicted of unlawful sexual contact and harassment against two teenage girls. *Id.*

at 212. After the jury was discharged, two jurors informed the petitioner's counsel that another juror, H.C., had exhibited racial bias against the petitioner and the petitioner's alibi witness during deliberations. *Id.* Under the trial court's supervision, the petitioner's counsel obtained affidavits from the two jurors in which they claimed that H.C. said, " 'I think he did it because he's Mexican,' " that " 'Mexican men had a bravado that caused them to believe they could do whatever they wanted with women,' " and, " 'nine times out of ten Mexican men were guilty of being aggressive toward women and young girls.' " *Id.* at 212-13. The affidavits also alleged that H.C. stated that he did not believe the petitioner's alibi witness because he was " 'an illegal.' " *Id.* at 213. The trial court acknowledged H.C.'s apparent racial bias, but still denied the petitioner's motion for a new trial because it believed the affidavits were inadmissible under the no impeachment rule. *Id.* at 214.

¶ 132   The Supreme Court reversed and remanded, holding that

> "where a juror makes a clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant, the Sixth Amendment requires that the no-impeachment rule give way in order to permit the trial court to consider the evidence of the juror's statement and any resulting denial of the jury trial guarantee." *Id.* at 225.

The Court cautioned, however, that "[n]ot every offhand comment indicating racial bias or hostility" is sufficient to justify further judicial inquiry. *Id.* There must be "a showing that one or more jurors made statements exhibiting overt racial bias that cast serious doubt on the fairness and impartiality of the jury's deliberations and resulting verdict." *Id.* In order to meet this threshold

showing, "the statement must tend to show that racial animus was a significant motivating factor in the juror's vote to convict." *Id.* at 225-26. Whether this standard has been satisfied is left to the discretion of the trial court in light of all circumstances, including the content, timing, and reliability of the alleged statements. *Id.* at 226.

¶ 133   The State puts forth several reasons why it believes Polk has failed to meet this threshold showing. First, the State points out that juror 40 was dismissed and was therefore not privy to the deliberations of the jury that rendered the verdict in this case. The State also observes that juror 40's notes to the trial court only alleged racial comments from juror 143, who was also dismissed and did not serve on the jury that convicted Polk. The State further contends that the juror 40's allegations (as summarized by Davis's sister) were "so vague that [she] could not even recall who said the 'n' word." Consequently, the State concludes that the allegations in this case are distinguishable from the detailed allegations of racial bias in *Pena-Rodriguez*.

¶ 134   The State is correct that juror 40's allegations, as filtered through Davis's sister, are not as specific as those in *Pena-Rodriguez*. However, this observation misses the point. The defense was significantly hindered in ascertaining the specifics of juror 40's allegations in this case because the trial court (1) dismissed Juror 40 without ever hearing directly from her and (2) prohibited the parties from having any communication with juror 40 after the verdict. Because of these circumstances, juror 40's claims come second-hand from Davis's sister, so it is not at all surprising that they are somewhat vague and incomplete.

¶ 135   We acknowledge that the trial court was faced with a difficult situation and took great care to uphold the integrity of the jury's deliberative process. However, we must conclude that the court abused its discretion in refusing to allow the defense to obtain juror 40's affidavit in order to get a fuller view of her allegations. In this regard, we note that preventing juror harassment is one obvious reason to limit postverdict contact with jurors. *Tanner v. United States*, 483 U.S. 107, 119-20 (1987). However, that is not a concern here. In fact, that juror 40's allegations came before the trial court at all was fueled by her desire to make them known. Not only did juror 40 reach out to Representative Ford about her experience, she was also eager to discuss the matter with Davis's sister. Juror 40 further took it upon herself to appear in court at a posttrial hearing and attempt to speak with defense counsel. It is not clear what else a lay juror should have been expected to do in order to come forward with her claims. See *Pena-Rodriguez*, 580 U.S. at 227 (recognizing that contacting defense counsel is a "common" way jurors bring allegations of misconduct). Indeed, Davis's sister's affidavit specifically claims juror 40 said she was willing to talk to the defense attorneys.

¶ 136   Our conclusion is further supported by the fact that jurors 120 and 40 had already leveled credible allegations of "racial bullying" against Juror 143, which ultimately led to juror 143's dismissal. The State observes that, at least in her notes to the trial court, juror 40 accused only juror 143 of making racial comments. However, juror 40's use of the term "they" in her conversations with Davis's sister suggest that multiple jurors may have used the " 'n' word' " and other racial slurs. Although this may be an inconsistency, it is also a possible consequence of filtering juror

40's claims through other parties. Just as juror 40's postdismissal allegations come second-hand through Davis's sister, juror 40's predismissal allegations came via juror 120, who was the foreperson and appears to have authored all the jury notes sent to the trial court. Moreover, as noted, the trial court never heard from juror 40 directly, despite interviewing several other jurors in this case. In our view, these circumstances only highlight the need to hear from juror 40 herself.

¶ 137   Finally, we note that the trial court determined that it was unnecessary to interview juror 40 after the verdict because the court believed she lacked credibility after refusing to honor her oath to uphold laws with which she disagreed. Although the trial court's credibility determinations are generally entitled to substantial deference, it is difficult to see how the court could arrive at a reliable assessment without hearing directly from juror 40. In short, our review of the record leads us to the inescapable conclusion that juror 40's plausible allegations of racial bias were not given their due. As the Supreme Court has made clear, the sixth amendment requires more to guard against racial discrimination, which "odious in all aspects, is especially pernicious in the administration of justice." (Internal quotation marks omitted.) *Id.* at 223.

¶ 138   Accordingly, we remand the matter for further inquiry into juror 40's claims, which can be done with minimal intrusion into the deliberative process. Assuming she is still willing to speak about the case, we believe the best way forward is, like in *Pena-Rodriguez*, to obtain an affidavit under the supervision of the trial court. The trial court may then consider that affidavit as it relates to racial bias and determine whether the allegations, if any, are sufficient to warrant further proceedings.

¶ 139    Although we remand the matter, we will address Polk's remaining arguments in the name of judicial economy, as they are likely to arise again if a new trial does not prove necessary. Additionally, we exercise our authority under Illinois Supreme Court Rule 615(b) (eff. Jan. 1, 1967) to retain jurisdiction over this cause.

¶ 140                                B. *Voir Dire*

¶ 141    Polk next contends that the trial court abused its discretion by failing to ask prospective jurors certain questions during *voir dire*.

¶ 142    *Voir dire* is designed to protect a defendant's constitutional right to an impartial jury. *People v. Encalado*, 2018 IL 122059, ¶ 24. More specifically, " '[t]he purpose of *voir dire* is to ascertain sufficient information about prospective jurors' beliefs and opinions so as to allow removal of those members of the venire whose minds are so closed by bias and prejudice that they cannot apply the law as instructed in accordance with their oath.' " *Id.* (quoting *People v. Cloutier*, 156 Ill. 2d 483, 495-96 (1993)). The scope, manner, and extent of *voir dire* is committed to the sound discretion of the trial court. *Id.* ¶ 25. "An abuse of discretion occurs when the conduct of the trial court thwarts the purpose of *voir dire* examination—namely, the selection of a jury free from bias or prejudice." *People v. Rinehart*, 2012 IL 111719, ¶ 16. A trial court does not abuse its discretion in conducting *voir dire* if it creates a reasonable assurance that any prejudice or bias would be discovered. *Id.*

¶ 143                                  1. Gang Bias

¶ 144    Here, Polk first argues that the trial court abused its discretion by insufficiently questioning the venire about potential bias toward street gangs. The trial court gave prospective jurors an extensive, 88-question questionnaire to assess potential biases, three of which addressed the topic of gangs. Specifically, the questionnaire asked:

(1) "Has any member of your immediate family or very close friend ever been involved in gang? If yes, please explain[;]"

(2) "Have you had any experiences observing, living near or dealing with the Black Souls street gang in Chicago? If yes, please explain"; and

(3) "There will be evidence, that some of the witnesses or participants in this case are gang members or associated with street gangs. Can you put aside any feelings or opinions of gang bias and decide the case fairly based only on the evidence presented and the law as provided to you by Judge McHale? If no, please explain[.]"

¶ 145    Even so, Polk contends that the trial court should have allowed additional gang questions during *voir dire*. His argument rests in large part on *People v. Strain*, 194 Ill. 2d 467, 477 (2000), where our supreme court held that, in light of the "considerable disfavor" with which many in the public view street gangs, "when testimony regarding gang membership and gang-related activity is to be an integral part of the defendant's trial, the defendant must be afforded an opportunity to question the prospective jurors, either directly or through questions submitted to the trial court,

concerning gang bias." In particular, Polk argues that the trial court failed to ask the venire whether they harbored bias against street gangs, which, according to him, "*Strain* required."

¶ 146   Contrary to Polk's suggestion, *Strain* did not require any specific question or wording be used, only that prospective jurors be questioned about gang bias. *Id.* This is precisely what the trial court did here by plainly asking potential jurors whether they could "put aside any feelings or opinions of gang bias and decide the case fairly based only on the evidence presented and the law."

¶ 147   Polk maintains that this question was insufficient because it "forced each individual venireperson to self-assess bias" and "suggested the answer [the court] deemed appropriate." We fail to see how the wording of the trial court's question was inappropriate. The question reasonably ensured that the jury would reach an impartial verdict, despite the fact that many of the trial participants were associated with street gangs. Thus, the purpose of *voir dire* was achieved, and there was no abuse of discretion.

¶ 148                                2. Drug Bias

¶ 149   Polk further argues that the trial court abused its discretion in denying the defense's request to ask prospective jurors about their attitudes toward drug use. Specifically, the defense sought to ask:

> "Do you have any family members or close friends who suffer from an addiction to illegal narcotics? If your answer is yes, do you believe that you could still render a fair and impartial decision in a case where some of the charges involve the sale and/or distribution of illegal narcotics?"

Alternatively, the defense requested to ask:

> "There may be evidence as to drugs in this case. Would such evidence impact your ability to be a fair and impartial juror in this case? If so, why?"

¶ 150   Initially, we note that Polk asserts that "[i]ncluding a question or two on the juror questionnaire would not have created any judicial hardship or complicated the *voir dire* process." While that may be true, that is not the inquiry on appeal. A particular *voir dire* question is not constitutionally required merely because it would have been easy to ask or even helpful to discovering bias. *Encalado*, 2018 IL 122059, ¶ 25. Rather, a trial court abuses its discretion in failing to ask a particular question only if it renders the proceedings fundamentally unfair. *Id.*

¶ 151   Polk also asserts that the trial court based its ruling on the mistaken belief that "Illinois precedent" prohibited it from asking the venire about drugs during *voir dire*. Specifically, Polk points to the court's citation to two Illinois cases, *People v. Abram*, 2016 IL App (1st) 132785, and *People v. Lanter*, 230 Ill. App. 3d 72 (1992). However, the record shows that the trial court merely cited these cases—correctly—for the proposition that it was not *required* to ask the defense's proposed questions about drugs.

¶ 152   In *Abram*, for example, this court affirmed the defendant's conviction for possession of cocaine with the intent to deliver over his contention that the trial court erred by failing to question prospective jurors about their biases against drug use and abuse. *Abram*, 2016 IL App (1st) 132785, ¶ 63. In so ruling, we acknowledged *Strain*'s holding with respect to gang bias, but explained that

this court has explicitly declined to extend the *Strain* rationale to bias against drug dealers. *Id.* (citing *People v. Dixon*, 382 Ill. App. 3d 233, 245 (2008)).

¶ 153 In *Lanter*, the Fourth District held that the trial court erred in failing to ask about drug and alcohol bias where the defendant raised an affirmative defense of his own intoxication in an aggravated assault case. *Lanter*, 230 Ill. App. 3d at 75-76. However, as the trial court stated in this case, *Lanter*'s holding has since been limited to cases where the defendant cites his own drug or alcohol use as an affirmative defense. See *Abram*, 2016 IL App (1st) 132785, ¶ 64; *Dixon*, 382 Ill. App. 3d at 244; *People v. Tenney*, 347 Ill. App. 3d 359, 369 (2004). Thus, *Lanter* does not apply here, as Polk's drug use was not a part of the trial in any way.

¶ 154 The heart of Polk's argument is that drugs and drug use are matters of "intense controversy in society" that "evoke strong feelings that could unduly bias a juror." In that respect, Polk analogizes his case to *Strain*. But, as explained, this court has already declined to extend the logic of *Strain* to the issue of drug bias. *Abram*, 2016 IL App (1st) 132785, ¶ 63; *Dixon*, 382 Ill. App. 3d at 245. Polk has also failed to cite any Illinois case requiring a trial court to *voir dire* prospective jurors about drug bias outside the context of *Lanter*. We see no reason to depart from this precedent here. Thus, we cannot find that the trial court abused its discretion during *voir dire*.

¶ 155                                    C. Jury Instructions

¶ 156 We next address the various arguments that Polk raises in opposition to the jury instructions. Except where otherwise noted, Polk concedes that he forfeited his challenges to the jury instructions by failing to object in the trial court or include them in a posttrial motion. *People*

*v. Sebby*, 2017 IL 119445, ¶ 48 ("To preserve a purported error for consideration by a reviewing court, a defendant must object to the error at trial and raise the error in a posttrial motion."). Despite this forfeiture, Polk urges us to review his claims under the plain error doctrine or, in the alternative, as a matter of ineffective assistance of counsel. Polk also contends that we may review his claims pursuant to Illinois Supreme Court Rule 451(c) (eff. Apr. 8, 2013).

¶ 157   The plain error doctrine allows a reviewing court to consider a forfeited claim where a clear or obvious error occurred at trial. *Sebby*, 2017 IL 119445, ¶ 48. Illinois courts have traditionally identified two scenarios in which to invoke the plain error doctrine: (1) where a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant and (2) where a clear or obvious error occurred and the error was so serious that it affected the fundamental fairness of the trial and challenged the integrity of the judicial process. *Id.*

¶ 158   To succeed on a claim of ineffective assistance of counsel, a defendant must prove that (1) his attorney's performance fell below an objective standard of reasonableness and (2) there is a reasonable probability that the result of the proceeding would have been different but for the attorney's errors. *People v. Cathey*, 2012 IL 111746, ¶ 23.

¶ 159   Rule 451(c) provides that "substantial defects [in jury instructions] are not waived by failure to make timely objections thereto if the interests of justice require." Ill. S. Ct. R. 451 (eff. Apr. 8, 2013). Rule 451(c) is construed identically to the plain error doctrine. *People v. Melecio*, 2017 IL App (1st) 141434, ¶ 44. Under any of theories, a defendant cannot prevail unless he first

demonstrates that a clear or obvious error occurred. *People v. Cox*, 2017 IL App (1st) 151536, ¶ 52.

¶ 160                          1. "Predicate Activity" Instruction

¶ 161   We first address Polk's challenge to what he calls the trial court's "Predicate Activity Instruction." Because there were no Illinois Pattern Jury Instructions for racketeering cases, the trial court modeled its instructions after the Federal Criminal Jury Instructions of the Seventh Circuit and caselaw interpreting the federal Racketeer Influence and Corrupt Organizations Act (18 U.S.C. §§ 1961 to 1968 (2012)) (federal RICO statute). Relevant here, the court instructed the jury that:

> "To find a pattern of predicate activity, you must find beyond a reasonable doubt that a defendant agreed that some members of the conspiracy would commit at least three separate predicate acts. You must also find that those acts were in some way related to each other and that there was continuity between them.
>
> * * *
>
> The State does not have to prove that any predicate acts were actually committed, or that a defendant agreed to personally commit any such acts, or that a defendant agreed that three or more specific acts would be committed."

¶ 162   Polk argues that the instruction's use of "a defendant" rather than "the defendant" allowed the jury to convict him so long as it found that any one of his codefendants agreed to the

commission of three predicate acts. He compares the instruction given in this case to the Seventh Circuit's pattern instruction, which states:

"In order to find a 'pattern of racketeering activity' for purposes of Count ___, you must find beyond a reasonable doubt that *the* defendant agreed that some member[s] of the conspiracy would commit at least two acts of racketeering as described in Count ___, [and that they were separate acts]. You must also find that those acts were in some way related to each other and that there was continuity between them." (Emphasis added.) Comm. on Fed. Criminal Jury Instructions of the Seventh Circuit, The William J. Bauer Pattern Criminal Jury Instructions of the Seventh Circuit 832 (2023 ed.) (18 U.S.C. § 1962(d) Racketeering Conspiracy-Elements).

¶ 163    Polk's argument is unavailing. Taking the instruction as a whole, and in full context, it is clear that the jury was asked to decide whether each particular defendant agreed that predicate acts be committed. For example, aside from the above-quoted instruction, the jury was also instructed that the State was required to prove beyond a reasonable doubt that "*each defendant* agreed with another person to the commission of the offense of racketeering, through a pattern of predicate activity" and "*each defendant* did so with the intent that the offense of racketeering be committed." (Emphases added.). Thus, there is no doubt that the instructions required the jury to find that Polk personally agreed that predicate acts be committed.

¶ 164    We are also unpersuaded by Polk's assertion that the final paragraph of the trial court's "predicate activity" instruction confused the jury as to the State's burden of proof by "negating"

or "contradicting" the first paragraph. More specifically, Polk takes issue with the language that the State did not have to prove that "a defendant agreed that three or more specific acts would be committed." According to Polk, this language forced the jury to decide whether to follow the statements of law in the first paragraph or the second.

¶ 165   However, this argument fails because there is no conflict. The language in question was taken directly from the pattern instructions of the United States Court of Appeals for the Seventh Circuit, which provide that "the government does not have to prove *** that the defendant agreed that two or more specific [predicate] acts would be committed." Comm. on Fed. Criminal Jury Instructions of the Seventh Circuit, The William J. Bauer Pattern Criminal Jury Instructions of the Seventh Circuit 834 (2023 ed.) (18 U.S.C. § 1962(d) Pattern Requirement-Racketeering Conspiracy). Polk's argument ignores the key word in the sentence: specific. Contrary to Polk's reading, the trial court's instruction in this case conveyed an accurate statement of the law: the State was required to prove that Polk agreed to the commission of three predicate acts, but they need not be any specific predicate acts. See *United States v. Tello*, 687 F.3d 785, 792-93 (7th Cir. 2012).

¶ 166   This point is illustrated by the Seventh Circuit's decision in *United States v. Briseno*, 843 F.3d 264, 274 (7th Cir. 2016), a case involving the federal RICO statute. In *Briseno*, the jury was instructed—consistent with the Seventh Circuit's pattern instructions—that " '[t]he government does not have to prove *** that the defendant agreed that two or more specific acts would be committed.' " (Emphases omitted.) *Id.* Like Polk, the defendant in *Briseno* argued that this

language was confusing to the jury and "internally inconsistent" with the court's other instruction that the government must prove he agreed to the commission of at least predicate acts. *Id.* The Seventh Circuit disagreed, explaining that "[a]lthough the difference between 'at least two acts' and 'two or more specific acts' may be a fine one, it does exist." *Id.* at 275. We agree with the Seventh Circuit's analysis and, thus, likewise find that the trial court did not err in this case. Because no error occurred, there can be no plain error or ineffective assistance of counsel. *Cox*, 2017 IL App (1st) 151536, ¶ 52.

¶ 167                    2. "Specific Unanimity" Instruction

¶ 168   Relatedly, Polk also contends that the trial court erred by failing to give the jury a "specific unanimity" instruction that it could not convict him of racketeering conspiracy unless it unanimously decided which three specific acts that he agreed be committed. Alternatively, Polk argues that the trial court was required to instruct the jury that it must unanimously agree on the specific "types" or "categories" of predicate acts that he agreed be committed.

¶ 169   However, Polk provides no support for the contention that the jury must agree on the three specific predicate acts involved. Nothing in the RICO statute warrants such an instruction, as it provides only that a defendant must agree that at least three predicate acts be committed. 720 ILCS 5/33G-4(a) (West 2012). Indeed, federal courts have routinely rejected Polk's argument in the context of the federal RICO statute. See, *e.g.*, *United States v. Rios*, 830 F.3d 403, 434 (6th Cir. 2016) ("[U]nanimity was not required as to the particular racketeering acts."); *United States v. Cornell*, 780 F.3d 616, 624 (4th Cir. 2015) ("To the extent Defendants argue that the district court

was required to charge the jury that it had to unanimously agree on the specific racketeering acts that the conspirators engaged in during the conspiracy, such a claim cannot succeed."); *United States v. Wilson*, 579 F. App'x 338, 347 (6th Cir. 2014) ("[T]o convict a defendant of RICO conspiracy, the jury need not be unanimous as to the specific predicate acts that the defendant agreed someone would commit.").

¶ 170   Polk's alternative argument—that the jury must be unanimous as to the general "types" or "categories" of predicate acts—is somewhat more supported, but ultimately unconvincing as well. As Polk points out, a handful of federal decisions have held that the jury must be unanimous as to the types of predicate acts that the defendant agreed be committed. See, *e.g.*, *id.* However, the statutory rationale for this holding is not so clear. The cases cited by Polk seemingly trace back to the Tenth Circuit's decision in *United States v. Randall*, 661 F.3d 1291 (10th Cir. 2011). In *Randall*, the defendant was convicted of racketeering conspiracy after the trial court instructed the jury that it " 'must be unanimous as to which type or types of predicate racketeering activity the defendant agreed would be committed; for example, at least two acts of drug trafficking.' " (Emphasis omitted.) *Id.* at 1296.

¶ 171   On appeal, the defendant argued that the trial court should have gone further and instructed the jury that it had to be unanimous as to the specific predicate acts involved. *Id.* Because the defendant had not objected to the jury instructions below, the *Randall* court analyzed the issue for plain error. *Id.* at 1297. The court concluded that there was no plain error, noting that it was an issue of first impression in the Tenth Circuit but that federal courts in other circuits had rejected

arguments like the defendant's. *Id.* at 1299. To conclude its analysis, the Tenth Circuit stated, "[W]e now join the circuits discussed above in concluding that for a charge of RICO conspiracy, a jury need only be unanimous as to the types of predicate racketeering acts that the defendant agree to commit, not the specific predicate acts themselves." *Id.*

¶ 172    However, we observe that none of the cases cited in *Randall* explicitly held that a "same types or categories" unanimity instruction was required. Instead, those cases merely (1) involved a "specific types or categories" unanimity instruction in the district court and (2) rejected the argument that a more specific unanimity instruction was required. See *United States v. Applins*, 637 F.3d 59, 82 (2d Cir. 2011) ("[W]e conclude that the district court's instruction was *sufficient* in requiring unanimity as to the types of predicate racketeering acts that the defendants agreed to commit without requiring a finding of specific predicate acts." (Emphasis added.)); *United States v. Hein*, 395 F. App'x 652, 656 (11th Cir. 2010) ("[The] argument that the jury had to unanimously agree on particular and individual acts and not just the general types of predicate offenses is not supported by the law and thus was not required in a jury instruction."); *United States v. Glecier*, 923 F.2d 496, 499-501 (7th Cir. 1991) (indictment for racketeering conspiracy need not identify specific predicate acts to which the defendant allegedly agreed).

¶ 173    Notably, not all federal circuits have agreed with the holding in *Randall*. For example, the Seventh Circuit has acknowledged the *Randall* line of cases but expressed "doubts" on whether a "types of racketeering" instruction should be required. *United States v. Schiro*, 679 F.3d 521, 533-34 (7th Cir. 2012). Generally, Illinois courts "may afford a Seventh Circuit decision more

persuasive value than we would the decisions of other federal courts, provided it is reasonable and logical." *State Bank of Cherry v. CGB Enterprises, Inc.*, 2013 IL 113836, ¶ 53. We find that this principle applies here because, just as there is no statutory basis to require unanimity as to the specific predicate acts, there is also basis in the statute to require unanimity as to the specific types or categories of predicate acts.

¶ 174   Regardless, even if we were to find that the trial court erred, any error would have been harmless. Specific unanimity instructions are "necessary only when there is a significant risk that the jury would return a guilty verdict even if there were less than unanimity with regard to one or more elements of the crime." *Schiro*, 679 F.3d at 533. Polk argues that that significant risk was present here "[g]iven the closely balanced evidence, as well as the legal and factual complexity of this six-week trial." He emphasizes that, by his count, the indictment alleged over 40 specific predicate acts falling within 10 types or categories. However, the trial evidence was focused on just three types of predicate acts: murder, delivery of a controlled substance, and possession of a controlled substance with the intent to deliver. Additionally, the evidence that Polk agreed to the commission of offenses in all three categories was overwhelming. *Id.* at 533-34 (lack of specific unanimity instruction would have been harmless in light of overwhelming evidence of predicate acts in various categories). Thus, Polk cannot establish plain error.

¶ 175                              3. *Mens Rea* Requirement

¶ 176 Polk next argues that the trial court's instructions erroneously omitted a *mens rea* requirement in two ways, thereby lessening the State's burden of proof. Specifically, Polk argues

that the instructions omitted the elements that (1) he *intentionally* participated in the operation or management of the NLBS and (2) he *knowingly* served as a leader of manager of the gang.

¶ 177    The RICO statute provides that:

"It is unlawful for any person, who *intentionally* participates in the operation or management of an enterprise, directly or indirectly, to:

* * *

(3) knowingly conspire to violate this Article." (Emphasis added.) 720 ILCS 5/33G-4(a) (West 2012).

In turn, the statute defines someone who participates in the " '[o]peration or management' " of an enterprise as "any person who *knowingly* serves as a leader, organizer, operator, manager, director, supervisor, financier, advisor, recruiter, supplier, or enforcer of an enterprise in violation of this Article." (Emphasis added.) *Id.* § 33G-3(d). Thus, the State was required to prove that Polk intentionally participated in the operation or management of the NLBS by knowingly serving as a leader, manager, or the like.

¶ 178                    a. Knowingly Served as Leader of the NLBS

¶ 179    With respect to the element that Polk knowingly served as a leader of the NLBS, the trial court gave two relevant instructions: the "Enterprise Instruction" and the "Racketeering Instruction." The Enterprise Instruction provided:

"To participate in the operation or management of an enterprise, a person must direct or carry out the enterprise's affairs by *knowingly* serving as a leader, organizer, operator ***." (Emphasis added.).

¶ 180 Polk concedes that the Enterprise Instruction accurately defined what it means to participate in the operation or management of an enterprise, including the key element that one must *knowingly* serve as a leader, manager, etc. However, Polk maintains that jury was forced to choose between this correct instruction and the incorrect Racketeering Instruction, which provided that "[a] person commits the offense of racketeering when he, in the operation or management of an enterprise, serves as a leader *** for an enterprise and knowingly participates, directly or indirectly, in the operation or management of that enterprise through a pattern of predicate activity."

¶ 181 According to Polk, the Racketeering Instruction is "flawed" and conflicts with the Enterprise Instruction because it omits the word "knowingly" before the phrase "serves as a leader *** for an enterprise." We disagree, as we are mindful that the instructions must be read in tandem rather than in isolation. *People v. Parker*, 223 Ill. 2d 494, 501 (2006). That is to say that the Racketeering Instruction includes the element that the defendant be "in the operation or management of an enterprise." As noted, participation in the operation or management of an enterprise has a specific statutory definition that requires the person to *knowingly* serve as a leader, manager, or the like. Although the Racketeering Instruction could have arguably included the word "knowingly" again, it would have been somewhat redundant because the "knowing" requirement

was already baked into the definition of operation or management of an enterprise. In any event, contrary to Polk's claims, the jury could not have convicted him without finding that he knowingly served as a leader or manager for the NLBS. Thus, there was no error, let alone plain error.

¶ 182                    b. Intentional Participation

¶ 183    As noted, Polk also argues that the jury instructions omitted the element that he *intentionally* participated in the operation or management of the NLBS.

¶ 184    The instructions defined the offense of racketeering conspiracy as follows:

"A person commits the offense of racketeering conspiracy when he, with the intent to commit the offense of racketeering, agrees with others to participate in the operation or management of an enterprise, directly or indirectly, through a pattern of predicate activity, and an overt act in furtherance of the agreement is committed by him or by a coconspirator."

The jury was further instructed that:

"To sustain the charge of Racketeering Conspiracy, the State must prove each of the following propositions beyond a reasonable doubt:

First proposition: That the [NLBS] constituted an enterprise; and

Second proposition: That each defendant agreed with another person to the offense of racketeering, through a pattern of predicate activity, in that he knowingly conspired to participate, directly or indirectly, in the operation or management of the enterprise; and

Third Proposition: That each defendant did so with the intent that the offense of racketeering be committed; and

Fourth Proposition: That an overt act in furtherance of the agreement was committed by him or by a coconspirator, even if that person is not on trial before you."

¶ 185 Following these instructions, the jury could not have convicted Polk unless it found that (1) he knowingly participated in the operation or management of the NLBS (2) while intending for the offense of racketeering to be committed. Even so, Polk maintains that the instructions should have stated that the jury must find that he intentionally participated in the operation or management of the NLBS by knowingly serving as one of its leaders. Polk's somewhat semantical argument is unconvincing. We find no functional difference between (1) intentionally participating in the operation of an enterprise by knowingly serving as a leader and (2) intending for an enterprise to commit racketeering while knowingly serving as it leader.

¶ 186 Moreover, any error would be harmless. "[A]n omitted jury instruction constitutes plain error only when the omission creates a serious risk that the jurors incorrectly convicted the defendant because they did not understand the applicable law, so as to severely threaten the fairness of the trial." *People v. Hopp*, 209 Ill. 2d 1, 12 (2004). Thus, an omitted instruction generally does not rise to the level of plain error where the evidence is overwhelming with respect to that element. *People v. Jones*, 81 Ill. 2d 1, 10 (1979) (instructional error on intent harmless where the defendant's intent to kill was "blatantly evident"); *People v. Carter*, 405 Ill. App. 3d 246, 253 (2010) (instructional error harmless where "[t]he evidence of [the] defendant's intent was

overwhelming"); *People v. Solis*, 216 Ill. App. 3d 11, 20 (1991) (omission of "intent to kill" element harmless where evidence of the defendant's intent was overwhelming).

¶ 187    Essentially, Polk maintains that the jury was not asked to decide whether he *intentionally* participated in the operation or management of the NLBS. But, by definition, one cannot participate in the operation or management of an enterprise at all unless he knowingly serves as a leader. Even assuming a person could sometimes knowingly, but unintentionally, serve as a leader of a criminal enterprise, that is clearly not the case here. Indeed, the jury specifically found beyond a reasonable doubt that Polk knowingly participated in the operation of the NLBS with the specific intention that a series of predicate crimes be committed. Thus, any error would have been harmless.

¶ 188                                    4. Accountability Instruction

¶ 189    Polk further argues that the trial court erred by instructing the jury on the law of accountability. Unlike his other jury instruction claims, Polk asserts that this issue was preserved because "[t]he defense objected" and he included the matter in his motion for a new trial. The State seems to disagree, noting that only counsel for Odum and Davis objected to the instruction and that Polk's posttrial motion includes only a general mention of jury instruction error.

¶ 190    The record shows that Polk satisfied the requirement that he object to the jury instruction in the trial court. Although Polk's counsel was not the one who raised an objection, the State fails to mention that the trial court had previously informed the attorneys for all defendants that "there is a standing policy that everyone is adopting everyone else's arguments. So by way of their

objecting, you are also objecting unless you opt out ***." As Polk's counsel did not opt out of the objection, it applied to him as well.

¶ 191    However, a contemporaneous objection alone is not enough to avoid forfeiture; a party ordinarily must also "raise the *specific issue* again in a posttrial motion to preserve any alleged error for review." (Emphasis added.) *People v. Woods*, 214 Ill. 2d 455, 470 (2005). The requirement that a party *specifically* identify the claim of error in a posttrial motion serves three main purposes: (1) it allows the trial judge, who is most familiar with the proceedings, to reconsider his earlier decision without the pressure of an ongoing trial; (2) it allows a reviewing court to ascertain from the record whether the trial court had the opportunity to reconsider its earlier ruling; and (3) it prevents litigants from "stating mere general objections and subsequently raising on appeal arguments which the trial judge was never given an opportunity to consider." *Brown v. Decatur Memorial Hospital*, 83 Ill. 2d 344, 349-50 (1980).

¶ 192    With regard to instructional error, Polk's motion for a new trial states only that "[t]he trial court erred when it gave certain jury instructions over the Defendant's objections." This is precisely the kind of "mere general objection" that the specificity rule was designed to prevent. Moreover, nothing in the record shows that the trial court had an opportunity to reconsider Polk's specific claim after the trial. Despite a lengthy hearing on the defendants' various posttrial motions, none of the defendants raised any attacks on the jury instructions, let alone the specific instruction in question here. Under these circumstances, we must conclude that Polk has forfeited the argument and therefore review the matter only for plain error.

¶ 193    Turning to the merits, the trial gave an accountability instruction based on Illinois Pattern Jury Instructions, Criminal, No. 5.03 (approved Oct. 28, 2016), that:

> "A person is legally responsible for the conduct of another person when, either before or during the commission of an offense, and with the intent to promote or facilitate the commission of an offense, he knowingly solicits, aids, abets, agrees to aid, or attempts to aid the other person in the planning or commission of an offense."

¶ 194    Polk does not contend that the instruction inaccurately stated the law, but rather that it was "inapplicable" to a conspiracy case and created a risk that the jury convicted him even if he did not personally agree that the underlying offenses be committed. For support, he cites this court's decision in *People v. Ulloa*, 2015 IL App (1st) 131632, ¶ 21, where, according to Polk, "the trial court committed reversible error in instructing the jury on accountability where the defendant was charged with criminal drug conspiracy."

¶ 195    However, *Ulloa* does not support Polk's position. There, the defendant was convicted of conspiring to deliver cocaine after the trial court gave a nonpattern conspiracy instruction to convict the defendant if either he " 'or one for whose conduct [he] is legally responsible' " agreed to the delivery of cocaine. *Id.* ¶ 20. We held that this instruction was plain error because it misstated conspiracy law by providing that the defendant did not have to personally agree that the delivery be committed. *Id.* ¶¶ 24-25.

¶ 196    In contrast to *Ulloa*, the trial court in the present case did not erroneously mix the language of accountability into its conspiracy instructions. Instead, the court accurately instructed the jury

that to find a particular defendant guilty of racketeering conspiracy, it had to find, among other things, that "*each defendant agreed* with another person to the commission of the offense of racketeering." (Emphasis added.). Similarly, the court instructed the jury that a conviction for criminal drug conspiracy required it to find that "*the defendant agreed* with others to the commission of the offenses of delivery of a controlled substance or possession of a controlled substance with the intent to deliver." (Emphasis added.). Thus, contrary to Polk's argument, the jury could not have convicted him of either charge unless it found that he personally agreed that the underlying offenses be committed.

¶ 197 In any event, any error in giving the accountability instruction was harmless. An unnecessary accountability instruction is generally harmless if there was sufficient evidence that the defendant committed the offense as a principal. *People ex rel. City of Chicago v. Le Mirage, Inc.,* 2013 IL App (1st) 093547-B, ¶ 85; *People v. Zirko*, 2012 IL App (1st) 092158, ¶ 39. As will be addressed more fully later, there was ample evidence that Polk agreed that the relevant offense be committed. We therefore find no plain error.

¶ 198                                  5. *Sears* Instruction

¶ 199 Polk also argues that the trial court erred by failing to give a so-called *Sears* instruction informing the jury that his agreement with a government agent—in this case confidential informant Alex Williams—could not support a charge of criminal conspiracy. *Sears v. United States*, 343 F.2d 139, 142 (5th Cir. 1965); see also *People v. Hensley*, 354 Ill. App. 3d 224, 231 (2004) (agreement between a defendant and a government agent only feigning agreement does not

constitute a conspiracy). More specifically, Polk asserts that there was a "strong likelihood" that the jury found that he conspired with Williams based on COH 2A, the recorded conversation in which he discusses recruiting "workers" to sell drugs. According to Polk, this conversation required a *Sears* instruction because it was the only direct evidence implicating him in drug trafficking and the circumstantial evidence that he conspired to commit drug crimes with others was "weak."

¶ 200    We disagree. First, neither Polk nor any of his codefendants requested a *Sears* instruction, so reversal is necessary only if the failure to give the instruction "resulted in a miscarriage of justice." *United States v. Tanner*, 628 F.3d 890, 906 (7th Cir. 2010). "Where the evidence clearly establishes that the defendant conspired with non-governmental participants, the mere fact that a government agent was involved in the scheme does not necessitate a *Sears* instruction." *United States v. Delgado*, 672 F.3d 320, 342 (5th Cir. 2012). Additionally, a trial court's failure to give a *Sears* instruction *sua sponte* is not plain error where the defendant did not advance the theory that the government agent was the only person with whom he agreed. *Id.* at 343; *United States v. Romero*, 282 F.3d 683, 689 (9th Cir. 2002); *United States v. Montgomery*, 150 F.3d 983, 996 (9th Cir. 1998).

¶ 201    Here, Polk did not raise a *Sears*-type defense. Moreover, he simply exaggerates the importance of the recorded conversation with Williams and downplays the strength of the other evidence tying him to various drug offenses. The record shows that there was ample evidence that Polk conspired with people other than Williams. Indeed, the jury specially found beyond a

reasonable doubt that Polk agreed to the murders of Snulligan and Taylor, which did not involve Williams in any way. With respect to the drug trafficking offenses, the jury also specially found that, at the very least, Frank Wynne, Briel Elverton, Rickey Ceasar, Bobby Scott, and Dawson were Polk's "coconspirator[s]." Thus, it is evident that the jury did not believe Polk conspired with Williams alone. The lack of a *Sears* instruction was therefore not plain error.

¶ 202                          6. "Reasonably Foreseeable Deaths" Instruction

¶ 203   Finally, Polk contends that his two life sentences based on the reasonably foreseeable unlawful deaths of Snulligan and Taylor should be vacated due to various instructional errors. Because Polk did not preserve these claims, we again review them for plain error.

¶ 204   Section 33G-5 of the RICO statute provides that:

"Wherever the unlawful death of any person or persons results as a necessary or natural consequence of any violation of this Article, the sentence imposed on the defendant shall include an enhanced term of imprisonment of at least 25 years up to natural life, in addition to any other penalty imposed by the court, provided:

(1) the death or deaths were reasonably foreseeable to the defendant to be sentenced; and

(2) the death or deaths occurred when the defendant was otherwise engaged in the violation of this Article as a whole." 720 ILCS 5/33G-5(c)(1)-(2) (West 2012).

¶ 205   Relevant here, the trial court instructed the jury on section 33G-5 as follows:

"To sustain the allegation made in connection with the offense of Racketeering conspiracy, the State must prove the following propositions:

That during the commission of the offense of Racketeering conspiracy, (1) an unlawful death or deaths were reasonably foreseeable to particular defendants; and (2) that the unlawful death or deaths occurred while those particular defendants were otherwise engaged in the Racketeering conspiracy.

If you find from your consideration of all the evidence that the above proposition has been proved beyond a reasonable doubt, then you should sign the verdict form finding the allegation was proven.

If you find from your consideration of all the evidence that the above proposition has not been proved beyond a reasonable doubt, then you should sign the verdict form finding the allegation was not proven."

¶ 206                                  a. "Proposition"

¶ 207   Polk first argues that the trial court erred by using the word "proposition" rather than "propositions" in the final sentence of the instruction. According to Polk, this "singular language" did not require the State to prove both that the unlawful death was foreseeable to him and that the death occurred while he was engaged in the racketeering conspiracy. Polk submits that the phrasing could have confused the jury into subjecting him to an enhanced sentence if it found that only one of the elements was proven beyond a reasonable doubt.

¶ 208   This argument fails. The use of the word "and" in the instruction is plainly conjunctive, meaning that the State was required to prove both elements. *In re M.M.*, 2016 IL 119932, ¶ 21 (the word "and" is generally interpreted as conjunctive). Additionally, the possibility of juror confusion was negated by the verdict forms, which asked whether each element was proven separately. For each of the unlawful deaths attributed to Polk, the jury indicated that the State proved both elements. Thus, no error occurred.

¶ 209                                   b. "Particular Defendants"

¶ 210   Polk further argues that the "confusing language" in the trial court's instruction allowed the jury to find that the State met its burden of proof so long as it found that a given unlawful death was reasonably foreseeable to any one of his codefendants. Specifically, Polk points to the language that the State must prove the unlawful death was reasonably foreseeable to "particular defendants" and that the death occurred while "those particular defendants" were engaged in a racketeering conspiracy. For example, Polk thus concludes that the jury could have found him eligible for the sentencing enhancement of section 33G-5 solely because it believed that Snulligan's death was reasonably foreseeable to Spears and occurred while Spears was otherwise engaged in the conspiracy.

¶ 211   Polk's argument is specious, but falls apart upon closer scrutiny. Aside from above-quoted instruction on section 33G-5, the trial court also instructed the jury that:

"If you find *a defendant* guilty of racketeering conspiracy and determine whether certain predicate activity has been proved, you should then continue with your deliberations to

decide whether the State has proved, beyond a reasonable doubt, that an unlawful death or deaths were reasonably foreseeable *to that defendant* and whether the unlawful death or deaths occurred while *that defendant* was otherwise engaged in the racketeering conspiracy." (Emphases added.).

¶ 212    That the inquiry was particularized to each individual defendant is also established in the verdict forms, which read, for example:

"Having found the defendant, ULYSSES POLK, guilty of Racketeering Conspiracy, we, the jury, further find the following:

c. Regarding the June 24, 2002 unlawful death of Charles Watson:

The death was reasonably foreseeable to ULYSSES POLK.

____Not Proven

____Proven

AND

The death occurred when ULYSSES POLK was otherwise engaged in the

Racketeering Conspiracy.

____Not Proven

____Proven."

¶ 213    Thus, contrary to Polk's argument, the jury was explicitly required to consider whether the unlawful deaths were reasonably foreseeable to him personally and whether they occurred while he personally was engaged in the conspiracy. We further note that the jury clearly understood that

the inquiry was individualized, as it found that a different combination of deaths were reasonably foreseeable to each codefendant. Consequently, there was no error.

¶ 214                                          c. "Proven"

¶ 215    Polk further argues that above-quoted portion of the verdict forms erroneously lowered the State's burden of proof by asking whether each element was merely "[p]roven" rather than proven beyond a reasonable doubt.

¶ 216    This argument is without merit. First, it is clear that the verdict forms referred to proof beyond a reasonable doubt, as that was the only standard of proof on which the jury was instructed. Second, the instructions on section 33G-5 expressly required proof beyond a reasonable doubt in multiple places. For instance, the trial court instructed the jury that:

> "To sustain the allegation made in connection with the offense of Racketeering conspiracy, the State must prove the following propositions:
>
> That during the commission of the offense of Racketeering conspiracy, (1) an unlawful death or deaths were reasonably foreseeable to particular defendants; and (2) that the unlawful death or deaths occurred while those particular defendants were otherwise engaged in the Racketeering conspiracy.
>
> If you find from your consideration of all the evidence that the above proposition *has been proved beyond a reasonable doubt*, then you should sign the verdict form finding the allegation was proven.

If you find from your consideration of all the evidence that the above proposition *has not been proved beyond a reasonable doubt*, then you should sign the verdict form finding the allegation was not proven." (Emphases added).

Similarly, the jury was instructed:

"If you find that a defendant is guilty of racketeering conspiracy and determine whether certain predicate activity has been proven, you should then continue with your deliberations to decide whether the State has proved, *beyond a reasonable doubt*, that an unlawful death or deaths were reasonably foreseeable to that defendant and whether the unlawful death or deaths occurred while that defendant was otherwise engaged in racketeering conspiracy." (Emphasis added.).

¶ 217    These instructions held the State to its burden of proof beyond a reasonable doubt. There was no error.

¶ 218                             d. "Necessary or Natural Consequence"

¶ 219    Polk next contends that the court's instructions erroneously omitted the element that the reasonably foreseeable death be a "necessary or natural consequence" of a racketeering violation. The State maintains that the "necessary or natural consequence" language in section 33G-5 is not a separate element, but rather a concept that is "subsumed" into the other requirements that trigger the sentencing enhancement.

¶ 220    The phrase "necessary or natural consequence," as used in section 33G-5, is derived from *Pinkerton v. United States*, 328 U.S. 640, 647-48 (1946), where the United States Supreme Court

held that a defendant may be convicted of a substantive offense committed by a coconspirator if the offense (1) was done in furtherance of the conspiracy, (2) fell within the scope of that conspiracy, and (3) was "reasonably foresee[able] as a necessary or natural consequence" of the conspiracy. Courts interpreting a defendant's liability under *Pinkerton* have since equated whether an act was a necessary or natural consequence of a conspiracy with whether it was reasonably foreseeable to the conspirators. See *United States v. Parkes*, 497 F.3d 220, 232 (2d Cir. 2007) ("An offense by a co-conspirator is deemed to be reasonably foreseeable if it is a necessary or natural consequence of the unlawful agreement." (Internal quotation marks omitted.)).

¶ 221   For example, the Seventh Circuit's pattern instruction on *Pinkerton* liability provides that the government must prove that the offense was "reasonably foreseeable" to the defendant and done in furtherance of the conspiracy without using the phrase "necessary or natural consequence." See 7th Cir. Court of Appeals Pattern Jury Instructions, Criminal, at 115-118 (2023 ed.). The same is true of the instructions here. The instructions (and verdict forms) in this case required the jury to determine (1) whether the State had proven that the unlawful deaths in question were reasonably foreseeable to each defendant and (2) whether those deaths occurred while the particular defendant was engaged in a racketeering conspiracy. Thus, there was no error.

¶ 222                              D. Sufficiency of the Evidence

¶ 223   Polk next argues that the State failed to prove his guilt beyond a reasonable doubt in various respects.

¶ 224 When a defendant challenges the sufficiency of the evidence, a reviewing court asks whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Conway*, 2023 IL 127670, ¶ 16. We will not retry the defendant, nor will we substitute our judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of the witnesses. *People v. Jones*, 2023 IL 127810, ¶ 28. It remains the role of the trier of fact to weigh the evidence, resolve conflicts in the testimony, and draw reasonable inferences from the facts. *People v. Galaraza*, 2023 IL 127678, ¶ 25. The trier of fact need not disregard inferences that flow normally from the evidence or elevate all possible innocent explanations to the level of reasonable doubt. *People v. Newton*, 2018 IL 122958, ¶ 24. Thus, in reviewing the evidence, we must draw all reasonable inferences in favor of the State. *Id.* The trier of fact's judgment will be reversed only if the evidence is so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt of the defendant's guilt. *Galaraza*, 2023 IL 127678, ¶ 26.

¶ 225 A person commits the offense of racketeering conspiracy when he (1) intentionally participates in the operation or management of an enterprise, (2) knowingly agrees with another to commit a substantive racketeering offense, and (3) either the person or one of his coconspirators commits an overt act in furtherance of the agreement. 720 ILCS 5/33G-4(a)(3) (West 2012). A substantive racketeering offense occurs when a person knowingly directs the affairs of an enterprise through a "pattern of predicate activity," which is defined as at least three occurrences of certain enumerated felonies. *Id.* §§ 33G-3(f), 33G-4(a)(1). The three predicate acts must also

take place after the statute's effective date, occur within a three-year period of one another, and be in some way related or have continuity among them. *Id.* § 33G-3(f).

¶ 226                              1. Intentional Participation in the NLBS

¶ 227 Polk first argues that the evidence was insufficient to establish that he intentionally participated in the operation or management of the NLBS. As noted, the RICO statute defines participating in the operation or management of an enterprise as "directing or carrying out the enterprise's affairs and is limited to any person who knowingly serves as a leader, organizer, operator, manager, director, supervisor, financier, advisor, recruiter, supplier, or enforcer."

¶ 228 The State presented evidence that Polk fulfilled several of these roles for the NLBS. Multiple witnesses testified that Polk held rank within the NLBS. Detective Rawski testified that Polk had been involved in the gang as far back as the 1990s. Brown's statement, taken in March 2013, established that Polk was "one of the top runners for the Black Souls" and "control[led] the 4100 block of Wilcox." This role was corroborated by Williams, who observed Polk distributing drugs to sellers and collecting money from them on a daily basis. In addition to this live testimony, the State also introduced a recorded conversation in which Polk discussed the drug trade and attempted to recruit Williams and others to sell drugs under his supervision. Moreover, the police recovered what Polk concedes is a "sizeable quantity" of cocaine from his apartment alongside other drug paraphernalia.

¶ 229 Polk attempts to refute this evidence by offering several reasons to discredit the State's witnesses, particularly Brown and Williams. However, it is the jury's role to determine the

credibility of the witnesses. *Galaraza*, 2023 IL 127678, ¶ 25. The jury considered all the points Polk raises on appeal, and apparently rejected them. Similarly, we are unpersuaded by Polk's alternative explanations for his narcotics-related actions. For example, he submits that he might have been dealing drugs independently from the NLBS or simply distributing drugs "as a favor" to Dawson without any knowledge or intent regarding the gang's operation. While these theories are arguably plausible, we must view the evidence in the light most favorable to the State. *Conway*, 2023 IL 127670, ¶ 16. The evidence showed that Polk operated his drug sales in NLBS territory alongside many other members of the gang. Thus, it is reasonable to infer that he had full knowledge and intent of his role within the NLBS. The jury, as trier of fact, was free to draw this inference from the evidence. *Galaraza*, 2023 IL 127678, ¶ 25.

¶ 230                    2. Murders of Snulligan and Taylor

¶ 231    Polk also argues that the State failed to prove that he agreed to the murders of Snulligan and Taylor, both of which the jury found to be part of the pattern of predicate activity underlying the racketeering conspiracy.

¶ 232    With respect to the Snulligan murder, Polk contends that his presence at the murder scene in the minutes before the murder was insufficient to infer he knew Spears would shoot Snulligan, especially because the murder occurred at a popular NLBS hangout. Although Polk is correct that his presence alone does not establish a conspiracy (*People v. Harper*, 2017 IL App (4th) 150045, ¶ 48), his characterization of the evidence is far from the light most favorable to the State. The evidence showed that not only was Polk present, but he was also examining the scene with other

NLBS members, including Spears, who would go on to shoot Snulligan just minutes later. Davis, who also on the scene with Polk, would later describe the NLBS members in the area as being "[a]ll at work" in a recorded conversation with Williams.

¶ 233    There was overwhelming evidence that Snulligan was killed because he openly complained about the NLBS selling drugs in his neighborhood and then "snitched" on Odum when he attempted to silence him. Given that Polk was a senior member of the NLBS, it was reasonable to infer that he was well aware of the gang's policy of violent retaliation against those who would impede their drug enterprise. Indeed, a recorded conversation showed that Polk and Dawson almost personally retaliated against Snulligan shortly before his murder, but could not because there were police in the area. Taking this evidence in the light most favorable to the State, a rational jury could have concluded that Polk agreed to Snulligan's murder.

¶ 234    The same is true of Taylor's murder. Although Polk maintains that there was "absolutely no evidence" connecting him to Taylor's murder, the State was not required to prove that he directly participated in the offense. *Tello*, 687 F.3d at 792. Rather, it is sufficient that the State prove he agreed that some other members of the conspiracy would murder Taylor. *Id.* As with all conspiracies, a defendant's agreement can be proven entirely through circumstantial evidence. *United States v. Volpendesto*, 746 F.3d 273, 284 (7th Cir. 2014). The evidence in this case showed that Taylor was murdered by junior members of the NLBS in response to an earlier killing of one of the gang's drug sellers. Again, the record shows that this was standard practice for the NLBS to protect its interests in the drug trade. Thus, taking the evidence in the light most favorable to the

State, a jury could have inferred that Polk agreed to the murder as one of the gang's high-ranking members.

¶ 235                                    3. Reasonably Foreseeable Deaths

¶ 236   Polk also challenges the evidence that the deaths of Snulligan and Watson were reasonably foreseeable to him.

¶ 237   As discussed, section 33G-5 of the RICO statute contains a sentencing enhancement if "the unlawful death of any person or persons results as a necessary or natural consequence of any violation of this Article *** provided:

> (1) the death or deaths were reasonably foreseeable to the defendant to be sentenced; and
>
> (2) the death or deaths occurred when the defendant was otherwise engaged in the violation of this Article as a whole." 720 ILCS 5/33G-5(c)(1)-(2) (West 2012).

¶ 238   As for the Snulligan murder, Polk argues that his presence at the murder scene and conversation with the soon-to-be murderer did not "prove that he knew that Spears was going to later shoot Snulligan." For the reasons detailed above, there is sufficient evidence to refute this assertion. Regardless, the inquiry for purposes of section 33G-5 is not whether Polk "knew" about the murder beforehand, but whether such an offense was reasonably foreseeable to him. *Id.*; see also *United States v. Serrano-Delgado*, 29 F.4th 16, 27 (1st Cir. 2022) ("But actual knowledge is not required under *Pinkerton*.").

¶ 239   Given Polk's substantial involvement in the NLBS, there is ample reason to conclude that Snulligan's death was reasonably foreseeable to him. Many courts have held that the use of weapons and violence are reasonably foreseeable consequences of drug trafficking conspiracies, especially where, as here, large quantities of drugs are involved. See, *e.g.*, *United States v. Curtis*, 324 F.3d 501, 506 (7th Cir. 2003); *United States v. Romero*, 897 F.2d 47, 52 (2d Cir. 1990); *United States v. Alvarez*, 755 F.2d 830, 849 (11th Cir. 1985). The record shows that the NLBS is no exception, as it had a long history of engaging in violent conduct, including murder, in order to facilitate its drug enterprise. This was particularly true for "snitches," or those who cooperated with the police. As Williams testified, "if you snitch, then you know nine times out of ten it's a good chance you'll get killed." Polk was undoubtedly aware of the NLBS's policies and history, as he had been a member of the gang since he was a teenager in the 1990s. Thus, the jury could have concluded that Snulligan's murder was reasonably foreseeable to him.

¶ 240   Much of the same applies to the Watson murder. Polk contends that his only involvement in that murder consisted of working "security" about half a block away from the abandoned building where Watson was killed for stealing money and drugs from the NLBS. However, the fact that Polk did not directly participate in Watson's murder does not preclude a finding that the death was reasonably foreseeable to him. Just as the NLBS harshly retaliated against "snitches," so too did it enforce rules against theft from the gang. The record shows that this policy was widely known. For example, according to Brown's statement, "workers know if they steal or f*** something up they will get killed." Similarly, Williams testified that the punishment for stealing

"could be as small as getting beat up" or "as heavy as getting killed," depending on the circumstances of the offense. Benamon testified that he was once personally "violated" or punished with a beating for stealing from a fellow NLBS member. It remains a reasonable inference that someone with Polk's status within the gang was also aware of these rules. Indeed, the State presented evidence that Polk both personally participated and ordered "violations" against lower-ranking members.

¶ 241   We also find no merit in Polk's suggestion that, even if he was aware that Watson would be beaten for his theft (which he concedes happened "often"), Watson's death was not a reasonably foreseeable consequence of that beating. First, as just discussed, the record shows that punishment for stealing could result in death depending on the particulars of the offense. Second, a victim's accidental death is not an unforeseeable consequence of a severe beating, even if it was not necessarily the intended result. *United States v. Rosalez*, 711 F.3d 1194, 1207 (10th Cir. 2013). This is particularly true, given the NLBS's penchant for heavy-handed retaliation. For example, Stokes was beaten to the point of hospitalization by his own uncle, despite later being cleared of the allegations for which Watson was murdered. In short, there was sufficient evidence for the jury to conclude that Watson's death was reasonably foreseeable to Polk.

¶ 242   Finally, Polk contends that the State failed to prove that he was "otherwise engaged in the violation of [the RICO statute] as a whole" at the time of Watson's death in 2002. More specifically, he argues that there was no evidence that, on the date of the Watson murder, he had

agreed that particular predicate acts would be committed after the effective date of the RICO statute.

¶ 243    We reject Polk's narrow interpretation of the RICO statute. The statute requires only that a reasonably foreseeable death occur "when the defendant was otherwise engaged in the violation of this Article as a whole." 720 ILCS 5/33G-5(c)(2) (West 2012). This language is broad and does not contain any time limitations. The only time limitations in the statute apply in the definition of predicate acts, which must occur after the effective date of the statute and within a three-year period of one another. *Id.* § 33G-3(f)(2). Contrary to Polk's assertion, enhancing his sentence based on Watson's reasonably foreseeable death does not "circumvent the RICO law's three-year limit on a pattern of racketeering activity." The concepts of reasonably foreseeable deaths and predicate activity are separate and distinct. There is no requirement that the reasonably foreseeable death be a part of the pattern of predicate activity or even qualify as a predicate act at all. Accordingly, Polk's argument is without merit.

¶ 244                    E. Severance

¶ 245    Polk next argues that the trial court erred by failing to sever his case from that of his codefendants, particularly Dawson, whom he describes as "the most culpable" and "main target" of the State's investigation.

¶ 246    "The general rule is that defendants jointly indicted are to be jointly tried unless fairness to one of the defendants requires a separate trial to avoid prejudice." *People v. Lee*, 87 Ill. 2d 182, 187 (1981). A defendant who does not wish to be tried jointly may file a pretrial motion for

severance. *People v. Bean*, 109 Ill. 2d 80, 92 (1985). The motion must set forth in detail how the defendant would be prejudiced by a joint trial; "[m]ere apprehensions" of prejudice are not enough. *Id.* at 92-93.

¶ 247   When ruling on a motion for severance, the trial court must "make a prediction about the likelihood of prejudice at trial, taking into account the papers presented, the arguments of counsel, and any other knowledge of the case developed from the proceedings." *People v. Daugherty*, 102 Ill. 2d 533, 541 (1985). In reviewing the denial of a pretrial motion for severance, we may consider only the arguments raised by the defendant, and not the subsequent events that occurred at trial. *People v. Mercado*, 397 Ill. App. 3d 622, 628 (2009). Still, the trial court has a continuing duty to grant a severance if prejudice appears during the trial. *Id.* The decision to grant a severance rests in the sound discretion of the trial court, and the decision will not be reversed on appeal absent an abuse of that discretion. *Bean*, 109 Ill. 2d at 93.

¶ 248   Our supreme court has identified two types of prejudice generally requiring a severance. The first type arises from the confrontation clause problem that occurs where a codefendant makes a statement implicating the defendant but the codefendant does not testify and is therefore unavailable for cross-examination. *People v. Olinger*, 112 Ill. 2d 324, 345 (1986). Polk does not raise this ground as a reason for severance. The second ground for severance occurs where the codefendants' defenses are "so antagonistic that one codefendant cannot receive a fair trial when tried jointly." *Id. at* 346.

¶ 249   Here, Polk argues that the trial court abused its discretion in denying him severance because his defense was antagonistic to his more culpable codefendants, particularly Dawson. However, Polk did not raise an antagonistic defense in this case. To warrant a severance based on antagonistic defenses, there must be "actual hostility" between the defendants. *People v. Rodriguez*, 289 Ill. App. 3d 223, 235 (1997). For example, defenses are antagonistic "where the trial becomes more of a contest between codefendants than between the State and defendants or one protests his innocence while condemning the other." *Mercado*, 397 Ill. App. 3d at 628; see also *Daugherty*, 102 Ill. 2d at 542 (the "classic example" of antagonistic defenses is where each defendant protests his innocence and condemns the others). Nothing of the sort occurred here.

¶ 250   Even so, Polk maintains that his defense was antagonistic to Dawson's in the sense that his "best defense" would have been to argue that the evidence only implicated Dawson and not himself. Polk asserts that he was deprived of the ability to raise this defense because of the conflict of interest created by attorney Becker's joint representation of him and Dawson. The State responds that Polk waived any conflict caused by the joint representation when he signed a form waiving "any potential conflict that George E. Becker may have in representing him in the above captioned matter based upon his current representation of Cornel Dawson, a codefendant in the same indictment." Polk counters that his waiver was not valid because the trial court never admonished him on the significance of the conflict.

¶ 251   A criminal defendant's sixth amendment right to the effective assistance of counsel includes the right to conflict-free representation. *People v. Nelson*, 2017 IL 120198, ¶ 29.

However, the mere fact that a single attorney represented multiple defendants does not create a *per se* conflict of interest. *Id.* Where, as here, joint defense counsel brings a potential conflict to the trial court's attention at an early stage of the proceedings, the trial court "must take adequate steps to deal with it." *People v. Jones*, 121 Ill. 2d 21, 28 (1988). More specifically, the court "must either appoint new counsel or perform a factual inquiry to determine if an actual conflict of interest exists." *People v. Turner*, 375 Ill. App. 3d 1101, 1106 (2007).

¶ 252   Additionally, a defendant may waive his right to conflict-free counsel. *People v. Poole*, 2015 IL App (4th) 130847, ¶ 34. However, the waiver must be made knowingly and intelligently, and is therefore "not valid unless the defendant is admonished regarding the existence and significance of the conflict." *Id.* Whether there has been a valid waiver of the right to conflict-free counsel depends on the totality of the circumstances surrounding the purported waiver. *Id.*

¶ 253   In this case, the trial court did not admonish Polk to ascertain whether his waiver of any conflict was knowing or intelligent. Attorney Becker represented that Polk and Dawson signed the waiver form after he "explained to them that there's a potential conflict," but the record does not contain any other relevant details of the conversation between attorney Becker and his client. Thus, there is no indication that Polk understood the significance of the potential conflict. Accordingly, we cannot say that Polk's validly waived any actual conflict of interest. *People v. Acevedo*, 2018 IL App (2d) 160562, ¶ 20 (the defendant's waiver not valid where the significance of his attorney's joint representation of a trial witness was not explained to him).

¶ 254 Waiver aside, however, we find that the trial court took adequate steps to ensure that there was no actual conflict. Notably, neither of Polk's attorneys articulated that they would have employed a different strategy if the court were to grant a severance. Although attorney Projanksy raised the possibility of a conflict due to Dawson's statements in COH 1K, the trial court determined that there was no conflict because "[a]ny attorney for Dawson is going to attack the credibility of Alex Williams, which is the same defense for Polk." We further note that attorney Projanksy did not labor under a joint representation and was, in fact, specifically brought on to mitigate any issue arising from attorney Becker's joint representation. The record shows that attorney Projansky zealously cross-examined the State's witnesses on Polk's behalf. She repeatedly attacked Williams's credibility, a strategy that was shared by all defendants.

¶ 255 In any event, Polk's claim that a severance would have allowed him to argue Dawson's guilt to the exclusion of his own relies on his assertion that he was a "less culpable player" in the NLBS. Although we agree that the evidence against Dawson was overwhelming, we do not, as discussed, agree that the evidence of Polk's guilt pales in comparison. Essentially, Polk's claim of a superior antagonistic defense is nothing more than speculation with the benefit of hindsight. That it would have been better to place blame on a codefendant can be raised in any case of unsuccessful joint representation. *People v. Berland*, 74 Ill. 2d 286, 301 (1978). However, such "hypothetical conflicts" do not rise to the level of an actual conflict or provide a basis to disturb a conviction. *Id.*

¶ 256 Similarly, we are not persuaded by Polk's argument that the disparity in the evidence against him and Dawson warranted a severance. Again, this argument rests largely on Polk's self-

serving characterization of the evidence against him. Additionally, although a gross disparity in the evidence will sometimes require a severance, a defendant must show that the disparity was so great that "the jury cannot reasonably be expected to compartmentalize the evidence as it relates to separate defendants." (Internal quotation marks omitted.) *People v. Byron*, 116 Ill. 2d 81, 93 (1987).

¶ 257   In arguing that the jury could not compartmentalize the evidence, Polk emphasizes the legal and factual complexity of this case. While this trial was indisputably a complex one, we do not find that this complexity required a severance.

¶ 258   First, because the defendants were charged as members of the same conspiracy, the vast majority of the evidence would have been admissible against Polk at a separate trial. *United States v. Sababu*, 891 F.2d 1308, 1331 (7th Cir. 1989); see *United States v. Tucker*, 12 F.4th 804, 825 (D.C. Cir. 2021) (disparity in evidence does not require severance where there is " 'substantial and independent evidence of each defendant's significant involvement in the conspiracy' " (quoting *United States v. Moore*, 651 F.3d 30, 96 (D.C. Cir. 2011))); *United States v. Searing*, 984 F.2d 960, 965 (8th Cir. 1993) ("In the context of conspiracy, severance will rarely, if ever, be required."); *People v. Lewis*, 243 Ill. App. 3d 618, 625 (1993) (severance not required where "most of the evidence at trial was admissible against all three defendants").

¶ 259   Second, the trial court's instructions made clear that the jury was to consider each defendant's case separately. *United States v. Mansoori*, 304 F.3d 635, 665-66 (7th Cir. 2002). For example, the jury was instructed to "give separate consideration to each defendant. Each is entitled

to have his case decided on the evidence and the law which applies to him." This theme was carried throughout the instructions, which required the jury to make particularized findings about each defendant's illicit agreements and role in the NLBS. Polk's arguments to the contrary are simply a rehashing of his arguments against the jury instructions, which we reject for reasons already explained. Absent some indication to the contrary, we ordinarily presume that the jury followed the court's limiting instructions. *People v. Boston*, 2018 IL App (1st) 140369, ¶ 75. We also note that, although each defendant was convicted on both counts, the jury returned different verdicts for each defendant insofar as it found a different set of unlawful deaths were reasonably foreseeable to each defendant. This gives further support to the notion that the jury was able to compartmentalize the evidence despite the complexity of the trial. *United States v. Benabe*, 436 F. App'x 639, 646 (7th Cir. 2011). For these reasons, we find that the trial court did not abuse its discretion in declining to sever Polk's trial.

¶ 260                       F. Sentencing

¶ 261    We next consider Polk's various sentencing challenges.

¶ 262                   1. Criminal Drug Conspiracy

¶ 263    With respect to sentencing, Polk first contends that we should vacate his 40-year sentence for criminal drug conspiracy because the jury did not find that he agreed to the possession of any "particular amount" of drugs.

¶ 264    As charged here, a defendant commits the offense of criminal drug conspiracy when he agrees with another to the commission of either (1) the offense of delivery of a controlled substance

or (2) the offense of possession of a controlled substance with the intent to deliver. 720 ILCS 570/401, 405.1(a) (West 2012). The sentencing range applicable to criminal drug conspiracy depends on the amount and type of drugs involved in the underlying offense to which the defendant agreed. *Id.* § 405.1(c).

¶ 265 In this case, the trial court gave an instruction modeled after Illinois Pattern Jury Instructions, Criminal, No. 17.32 (4th ed. 2000), that:

"To sustain the charge of criminal drug conspiracy, the State must prove the following propositions:

First: That the defendant agreed with others to the commission of the offenses of delivery of a controlled substance or possession of a controlled substance with the intent to deliver; and

Second: That the defendant did so with the intent that the offenses of delivery of a controlled substance or possession of a controlled substance with the intent to deliver be committed; and

Third: That an act in furtherance of the agreement was performed by any party to the agreement.

If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty.

If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty."

¶ 266 The corresponding verdict form first asked the jury whether it found Polk guilty or not guilty of criminal drug conspiracy. The form then stated:

"Having found the defendant, ULYSSES POLK, guilty of Criminal Drug Conspiracy, we, the jury, further find that the following acts in furtherance of the agreement have been proven to have been committed by the defendant, or by any conspirator, as follows:"

Immediately under that, the form asked the jury to decide whether the State had "proven" six specific acts of possession with the intent to deliver. For instance, the verdict form stated:

"On or about June 13, 2013, through coconspirator SCOTT, 263.4 grams of heroin was possessed with the intent to deliver.

___ Not Proven

___ Proven."

¶ 267 The jury found that all six acts were proven, with the largest amount of drugs involved being Scott's possession of 263.4 grams of heroin with the intent to deliver. Based on this amount, the trial court sentenced Polk to 40 years in prison for criminal drug conspiracy. See 720 ILCS 570/401(a)(1)(B) (West 2012) (possession with intent to deliver more than 100 grams but less than 400 grams of heroin punishable by 9 to 40 years in prison).

¶ 268   Polk argues that the jury's verdict established only that he conspired to possess with the intent to deliver some unspecified amount of cocaine or heroin. Because Polk maintains that the jury did not find he *agreed* to the possession of any specific quantity of drugs as part of the conspiracy, he concludes that the trial court could not have imposed an extended sentence for criminal drug conspiracy.

¶ 269   In *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), the United States Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt." Conspiracy to possess heroin with the intent to deliver generally carries a Class 2 felony sentence of three to seven years in prison. 720 ILCS 570/401(d), 405.1(c) (West 2012); 730 ILCS 5/5-4.5-35(a) (West 2012). The offense becomes punishable by up to 40 years in prison when the object of the conspiracy is to possess more than 100 grams of heroin. 720 ILCS 570/401(a)(1)(B) (West 2012). Consequently, the quantity of drugs that the defendant agreed be possessed is a fact that must be presented to the jury and proven beyond a reasonable doubt.

¶ 270   *Ulloa* is illustrative. There, the defendant was convicted of participating in a criminal drug conspiracy to deliver cocaine. *Ulloa*, 2015 IL App (1st) 131632, ¶ 12. He was sentenced to 20 years in prison, which was commensurate with a conspiracy involving more than 900 grams of cocaine. *Id.*; 720 ILCS 570/401 (West 2012). In reversing the defendant's conviction, based on the instructional defects discussed above, we explained that, on remand, "the court must instruct the jurors that to find [the defendant] guilty as charged, they must find that he agreed to the delivery

of more than 900 grams of a substance containing cocaine." (Emphasis added.) *Ulloa*, 2015 IL App (1st) 131632 ¶ 27 (citing *Apprendi*, 530 U.S. at 490).

¶ 271 Here, the verdict forms did not ask the jury to decide whether Polk agreed to the possession of any particular quantity of drugs. Instead, the jury was asked only to decide whether Polk agreed to the possession of drugs with the intent to deliver generally. Although the jury also found that certain coconspirators actually possessed some specific quantities of drugs with the intent to deliver, this is not a substitute for a finding that Polk personally agreed to their possession of those amounts. Thus, Polk's 40-year sentence violated *Apprendi*.

¶ 272 However, our analysis does not end there. An *Apprendi* violation is subject to both plain error and harmless error review. *People v. Thurow*, 203 Ill. 2d 352, 363-68 (2003). The type of review appropriate in a particular case depends on whether the defendant raised a timely objection in the trial court. *People v. Nitz*, 219 Ill. 2d 400, 409-10 (2006). Where the defendant raised an objection, the violation is reviewed for harmless error. *Id.* If the defendant did not object, however, plain error analysis applies. *Id.* at 410. The difference is important because it affects which party carries the burden of proof. *Id.* In a harmless error analysis, the State must prove beyond a reasonable doubt that the result of the proceeding would have been the same absent the error. *Thurow*, 203 Ill. 2d at 363. Under a plain error analysis, however, the defendant must prove that the error was prejudicial. *Id.*

¶ 273 Because Polk did not object to the *Apprendi* violation in the trial court, we review the matter for plain error. In performing this analysis, we must "examine the evidence adduced at trial

and determine objectively whether a rational jury would have made the finding in question." *Nitz*, 219 Ill. 2d at 414.

¶ 274    As noted, Polk's enhanced sentence for criminal drug conspiracy was based on Scott's possession of 263.4 grams of heroin. Thus, we must determine whether a rational jury would have found that Polk agreed to Scott's possession of that particular amount. Our review of the record compels us to answer that question in the negative. Although there was overwhelming evidence that Polk was an active participant in an elaborate drug trafficking conspiracy, the evidence of Scott's involvement in that conspiracy was far weaker. The State's evidence with respect to Scott was essentially that (1) he sold drugs at least three times in NLBS territory and (2) the police found a substantial amount of heroin in his apartment when they arrived to execute his arrest warrant. Missing from the evidence, however, was any direct connection between Scott and Polk. For example, there was no evidence that Polk or any of his codefendants communicated with or about Scott. To be sure, a rational jury could have considered the fact that Scott sold drugs in NLBS as circumstantial evidence that he was part of the larger NLBS conspiracy. Indeed, there was testimony that the gang would not have looked kindly on outsiders selling drugs on their turf. Yet, there was also evidence that the NLBS sometimes retaliated against those who encroached on their territory, which suggests it is possible that Scott was not acting in concert with NLBS leadership. Ultimately, the evidence was at least closely balanced as to whether Polk agreed to Scott's possession of heroin, so we must vacate his sentence for criminal drug conspiracy.

¶ 275   Polk maintains that the matter should be remanded so that he can be resentenced to a Class 2 felony sentence of three to seven years, the range applicable to a criminal drug conspiracy involving "any other amount" of a controlled substance. 720 ILCS 570/401(d) (West 2012). We disagree. Although we cannot say with confidence that a rational jury would have found that Polk agreed to Scott's possession of heroin, the same is not true for some of the other acts of possession that the jury found to have occurred. Most relevant, the jury found that Polk himself possessed 48.6 grams of cocaine with the intent to deliver, which was the amount found in his residence alongside several pieces of drug-processing paraphernalia.

¶ 276   Of course, the evidence that Polk agreed to this possession as part of the conspiracy was much stronger than the evidence tying him to Scott. The evidence showed that Polk was a senior member of the NLBS who acted as a "top runner" by distributing drugs to lower-level sellers and collecting money from the sales. We therefore have no doubt that a rational jury would have found that Polk agreed to the possession of at least 48.6 grams of heroin. The sentencing range for a criminal drug conspiracy involving that amount is 6 to 30 years in prison. *Id.* §§ 401(a)(2)(A), 405.1(c). Thus, if a new trial does not prove necessary, Polk should be re-sentenced to a sentence within that range.

¶ 277                            2. Racketeering Conspiracy Sentence

¶ 278   Finally, Polk challenges his life sentences for racketeering conspiracy. Once again, Polk concedes that he has forfeited this issue by failing to raise it in the trial court but urges us to review the sentence under the second prong of the plain error doctrine. We agree that wrongfully imposing

a life sentence rises to the level of a serious structural error. *People v. Russell*, 2022 IL App (2d) 190733, ¶ 55 (error in imposing an extended sentence was second prong plain error). Thus, we will review the issue for plain error.

¶ 279                                        a. Section 33G-5(a)

¶ 280   To resolve Polk's claim, we must interpret the RICO statute, which we do *de novo*. *People v. Clark*, 2019 IL 122891, ¶ 17. "The primary goal of statutory construction is to ascertain and give effect to the true intent of the legislature." *Id.* ¶ 18. The language of the statute, given its plain and ordinary meaning, is the best indicator of legislative intent. *Id.* ¶ 20. A reviewing court may also consider "the reason for the law, the problems sought to be remedied, the purposes to be achieved, and the consequences of construing the statute one way or another." *Id.* Where the statute is clear and unambiguous, a court must apply it as written without resorting to extrinsic aids to statutory construction. *People v. Giraud*, 2012 IL 113116, ¶ 6.

¶ 281   In this case, Polk was convicted of racketeering conspiracy in violation of section 33G-4(a)(3) of the RICO statute (720 ILCS 33G-4(a)(3) (West 2012)). Section 33G-5, entitled "Penalties," provides that "[a]ny violation of subsection (a) of Section 33G-4 of this Article shall be sentenced as a Class X felony with a term of imprisonment of not less than 7 years and not more than 30 years, or the sentence applicable to the underlying predicate activity, whichever is higher ***." *Id.* § 33G-5(a).

¶ 282   Construing section 33G-5, the trial court sentenced Polk to life in prison, based on the jury's finding that the predicate activity included the murders of Snulligan and Taylor. See 730

ILCS 5/5-8-1(a)(1)(c)(ii)  (West 2012) (requiring a life sentence for a non-juvenile defendant found guilty of more than one murder); 720 ILCS 5/33G-3(e) (West 2012) (defining "predicate activity" to include first degree murder).

¶ 283   Polk's argues, however, that the second clause of section 33G-5(a) does not apply to his conviction for racketeering conspiracy because predicate activity cannot "underlie" a conspiracy. For support, Polk points to section 33G-4(e) of the RICO statute, which states:

> "(e) Any person prosecuted under this Article may be convicted and sentenced either:
>
> (1) for the offense of conspiring to violate this Article, and for any other particular offense or offenses that may be one of the objects of a conspiracy to violate this Article; or
>
> (2) for the offense of violating this Article, and for any other particular offense or offenses that may constitute predicate activity underlying a violation of this Article."
>
> *Id*. § 33G-4(e).

¶ 284   According to Polk, section 33G-4(e) shows that racketeering conspiracies are associated only with "objects," rather than "underlying" predicate activity. However, section 33G-4(e) is of little relevance to the question now before us, as it cannot be read to limit the punishments available under the RICO statute. Instead, it merely provides that a defendant can be separately convicted and sentenced under both the RICO statute and any other criminal statute relevant to the acts involved in the racketeering violation. But section 33G-4(e) is silent as to how a sentence for a

racketeering violation is determined. That information is contained solely in section 33G-5, the statute's only sentencing provision.

¶ 285   Under Polk's construction of the statute, a defendant convicted of racketeering conspiracy could never be sentenced to anything other than 7 to 30 years in prison because, by definition, predicate activity will never "underlie" the conspiracy charge. However, that interpretation conflicts with the plain language of section 33G-5, which provides that "[a]ny violation" of section 33G-4(a) may be punishable by a longer sentence applicable to its underlying predicate activity. *Id.* § 33G-5(a). Had the legislature intended to exclude racketeering conspiracies from the statute's enhanced sentencing provision, it would have said so.

¶ 286   Additionally, defendant's interpretation of "underlying" is not in keeping with the plain and ordinary meaning of the word. *Clark*, 2019 IL 122891, ¶ 20 (best indicator of legislative intent is the "plain and ordinary meaning" of the statutory language). For example, the Merriam-Webster Online Dictionary defines "underlying" as (1) "lying beneath or below"; (2) "BASIC, FUNDAMENTAL"; (3) "evident only on close inspection"; (4) "anterior or prior in claim"; and (5) "of or being present in deep structure." Meriam-Webster Online Dictionary, https://www.merriam-webster.com/dictrionary/underlying (last visited June 16, 2024) [https://perma.cc/3QLN-BY9F]. None of these definitions support Polk's position.

¶ 287   Nevertheless, Polk insists that the legislature used "underlying" in section 33G-5 according to its "settled *legal* meaning" that "[o]ne crime or conviction 'underlies' another if it is logically necessary to the existence of the second, most frequently as an *element* of the second." However,

Polk gives no real support for this overly-narrow definition, nor does it comport with the stated purpose of the RICO statute, which is to enhance the "inadequate remedies, procedures, and punishments" available under existing criminal statutes. 720 ILCS 5/33G-2 (West 2012).

¶ 288    We also note that a construction similar to Polk's has been rejected in the context of the federal RICO statute. *In re Appointment of Special Prosecutor*, 2019 IL 122949, ¶ 35 (in interpreting Illinois statutes, Illinois courts may look to federal decisions interpreting similarly worded federal statutes). Like our RICO statute, the federal statute lists substantive racketeering violations and racketeering conspiracy in a single section, section 1962 of Title 18 of the United States Code (18 U.S.C. § 1962 (2012)). The sentencing section of the federal statute then provides that "[w]hoever violates any provision of section 1962 of this chapter shall be fined under this title or imprisoned not more than 20 years (or for life if the violation is based on a racketeering activity for which the maximum penalty includes life imprisonment), or both." *Id.* § 1963(a).

¶ 289    In *United States v. Hernandez-Guevara*, No. 19-4679, 2021 WL 4316031, at *1 (4th Cir. Sept. 23, 2021), the defendant challenged his 24-year racketeering conspiracy sentencing by arguing that the phrase "based on" in section 1963 meant that the sentencing enhancement was triggered only if the racketeering activity was an element of the racketeering violation. Because the completion of a racketeering activity is not an element of a racketeering conspiracy, the defendant reasoned that a racketeering conspiracy could never be punishable by more than 20 years in prison. *Id.*

¶ 290   The Fourth Circuit disagreed, finding the defendant's construction inconsistent with the plain meaning and context of the statutory language. *Id.* at *2. The court explained that the defendant's interpretation "effectively rewrites § 1963(a), which applies to a violation of '*any* provision of 1962,' including RICO conspiracy under § 1962(d)." (Emphasis in original.) *Id.* Moreover, as noted in *Hernandez-Guevara*, other federal courts have implicitly rejected this argument by routinely imposing sentences of longer than 20 years for racketeering conspiracy. See, *e.g.*, *Johnson v. United States*, 64 F.4th 715, 728-29 (6th Cir. 2023); *United States v. Farmer*, 38 F.4th 591, 604 (7th Cir. 2022); *United States v. Perez*, 21 F.4th 490, 493-94 (7th Cir. 2021); *United States v. Gomez*, 705 F.3d 68, 72 (2d Cir. 2013); *United States v. Martinez*, 657 F.3d 811, 816 (9th Cir. 2011); *United States v. Flores*, 572 F.3d 1254, 1268 (11th Cir. 2009) (*per curiam*). Indeed, we are aware of no federal case holding that section 1963's sentencing enhancement does not apply to racketeering conspiracy convictions.

¶ 291   In an effort to distinguish this federal caselaw, Polk observes that the term "underlying" as used in the Illinois RICO statute is different than the "based on" language of the federal statute. Although "underlying" and "based on" are obviously different terms, they are essentially synonymous. In any event, the principle remains that either term must be construed within the context of the overall statutory scheme. *Hernandez-Guevara*, 2021 WL 4316031, at *2 (rejecting the defendant's reliance on the meaning of "based on" in other statutes). Even if some statutes use "underlying" in the narrow sense that Polk suggests (a contention for which he offers little support), it does not necessarily follow that that interpretation applies to the RICO statute. " '[T]he

same word may mean one thing in one statute and something different in another, dependent upon the connection in which the word is used, the object or purpose of the statute and the consequences which probably will result from the proposed construction.' [Citations.]" *People v. Ligon*, 2016 IL 118023, ¶ 26 (quoting *Mack v. Seaman*, 113 Ill. App. 3d 151, 154 (1983)). Reading the RICO statute as a whole, it is clear that the legislature intended the sentencing enhancement of section 33G-5 to apply to all racketeering violations, including racketeering conspiracies. Thus, the trial court did not err.

¶ 292                                   b. Proportionate Penalties Clause

¶ 293    Alternatively, Polk argues that the RICO statute's sentencing scheme, as applied to him, violated both the proportionate penalties clause of the Illinois Constitution and the eighth amendment to the United States Constitution.

¶ 294    As a general matter, the legislature has the power to define the penalty for an offense, which includes the power to restrict a trial court's discretion by requiring a mandatory sentence. *People v. Huddleston*, 212 Ill. 2d 107, 129 (2004). Of course, a sentence must still satisfy constitutional requirements as applied to the particular defendant. *Id.* However, a defendant raising an as-applied challenge to a mandatory sentencing scheme must overcome a strong presumption of constitutionality by "clearly establishing that the mandatory sentencing statute at issue is invalid when applied to him." *People v. House*, 2021 IL 125124, ¶ 18. We review such a claim *de novo*. *Id.*

¶ 295    The proportionate penalties clause states that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. As relevant here, a statute violates this clause if it requires a punishment that is "cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community." *People v. Miller*, 202 Ill. 2d 328, 338 (2002). Our supreme court has not defined what kind of punishments violate this standard because "as our society evolves, so too do our concepts of elemental decency and fairness which shape the 'moral sense' of the community." *Id.* at 339. Thus, our task is to review the seriousness of the offense and the severity of the sentence within the context of our community's ever-evolving standards of decency. *People v. Hilliard*, 2023 IL 128186, ¶ 21.

¶ 296    Similarly, the eighth amendment to the United States Constitution, which applies to the states through the fourteenth amendment (*People v. Dorsey*, 2021 IL 123010, ¶ 37) bans "cruel and unusual punishments" (U.S. Const., amend. VIII). Inherent in the eighth amendment is the concept that a sentence must be proportional to the offense. *People v. Buffer*, 2019 IL 122327, ¶ 15. As with the proportionate penalties clause, a court must examine whether a sentence is cruel and unusual by society's evolving standards of moral decency. *Id.* Our supreme court has stated that the eighth amendment is not violated where a sentence does not offend the proportionate penalties clause. *People v. Coty*, 2020 IL 123972, ¶ 45; see *People v. Walker*, 2022 IL App (1st) 201151, ¶ 26 ("Thus, the proportionate penalties clause goes further than the eighth amendment in offering protection against oppressive penalties.").

¶ 297   In this case, Polk's mandatory life sentence for racketeering conspiracy resulted from the convergence of two statutes. First, section 33G-5(a) of the RICO statute requires that a racketeering conspiracy be punished by a Class X felony sentence "or the sentence applicable to the underlying predicate activity, whichever is higher." 720 ILCS 5/33G-5(a) (West 2012). As noted, the jury found that the "underlying predicate activity" included the murders of Snulligan and Taylor. A non-juvenile defendant convicted of more than one murder must be sentenced to natural life in prison. 730 ILCS 5/5-8-1(a)(1)(c)(ii) (West 2018).

¶ 298   Polk argues that his sentence shocks the moral sense of the community for three main reasons: (1) racketeering conspiracy is by nature an inchoate offense, (2) he was not personally involved in either murder, and (3) he had only "peripheral involvement" in the NLBS.

¶ 299   Each of these points is unpersuasive. First, although racketeering conspiracy is considered an inchoate offense (*Iannelli v. United States*, 420 U.S. 770, 777 (1975)), we must consider the particular facts of this case when evaluating Polk's as-applied challenge. *Hilliard*, 2023 IL 128186, ¶ 21. The evidence showed that Polk was part of a conspiracy that committed numerous predicate crimes, including crimes of violence, over a period of several years. Second, Polk's argument that he was not involved in either predicate murder is essentially a rehashing of his arguments regarding the sufficiency of the evidence. Although Polk did not personally commit either murder, the jury found beyond a reasonable doubt that he agreed each murder would be committed in furtherance of a violent criminal enterprise. Third, the record also belies Polk's insistence that he was not involved in the leadership of the NLBS. We further observe that, at least for nonjuvenile

defendants like Polk, courts have found that a mandatory life sentence for multiple murders generally does not offend the proportionate penalties clause or eighth amendment.[6] *People v. Davis*, 2014 IL 115595, ¶ 43; *People v. White*, 2020 IL App (5th) 170345, ¶¶ 19-29. Based on the specific circumstances of this case, we cannot say that Polk's mandatory life sentence was so wholly disproportionate to the offense that it shocks the moral sense of the community. Accordingly, Polk's sentence violates neither the proportionate penalties clause nor the eighth amendment.

¶ 300                                    c. Double Enhancement

¶ 301    Lastly, Polk argues that we should vacate his life sentence for the reasonably foreseeable unlawful death of Snulligan "[b]ecause a single crime *** cannot be used twice to impose two life terms." In advancing this brief, two-sentence argument, Polk cites only one point of authority, *People v. White*, 114 Ill. 2d 61, 66 (1986). However, *White* does not support Polk's argument because it did not involve multiple sentences for a single crime. Rather, *White* held that, in fashioning a sentence for the aggravated battery of a child, the trial court erred in considering the young age of the victim as an aggravating factor because it was inherent in the offense itself. *Id.*

¶ 302    Perhaps Polk meant to argue that, like his codefendants, his sentence for Snulligan's reasonably foreseeable death constituted an improper double enhancement because Snulligan's murder was also used to establish the pattern of predicate activity underlying the charge of racketeering conspiracy. Consistent with *White*, courts have held that a single factor generally may

---

[6]Polk was 31 years old at the time of both the Snulligan and Taylor murders.

not be used both as an element of the offense and as a basis for imposing a harsher sentence than might otherwise have been imposed. *People v. Phelps*, 211 Ill. 2d 1, 11-12 (2004). This rule against so-called "double enhancements" is based on the notion that the legislature has already considered all factors inherent in an offense when determining an appropriate sentencing range. *People v. Guevara*, 216 Ill. 2d 533, 545 (2005).

¶ 303   Given this rationale, it follows, then, that there is an exception to the rule against double enhancements where the legislature clearly intended to allow for one. *People v. Powell*, 2012 IL App (1st) 102363, ¶ 8. To determine whether the legislature intended to allow a double enhancement, we must examine the statutory language itself. *Phelps*, 211 Ill. 2d at 15. As with other issues of statutory interpretation, we review the matter *de novo*. *Guevara*, 216 Ill. 2d at 546.

¶ 304   A review of the RICO statute shows that the legislature intended for the kind of double enhancement that occurred here. We begin with the explicit purpose of the statute, which was to remedy what the legislature viewed as "inadequate" existing penalties for the violence wrought by street gangs and other organized criminal enterprises. 720 ILCS 5/33G-2 (West 2012). Thus, the legislature required that any sentence for a reasonably foreseeable unlawful death "*shall* include an enhanced term of imprisonment of at least 25 years up to natural life, *in addition to* any other penalty imposed by the court." (Emphases added.) *Id.* § 33G-5(c). Moreover, the statutory definitions of both "predicate activity" and "unlawful death" specifically include first degree murder. *Id.* § 33G-3(e)(1), (g). Thus, the legislature clearly contemplated that a murder could, at least separately, form part of the pattern of predicate activity and trigger the additional penalty for

a reasonably foreseeable unlawful death. Yet, the legislature did not create an exception to the reasonably foreseeable death provision for cases in which the predicate activity included murder. *Id.* § 33G-5(c) (applying the reasonably foreseeable death provision to "any violation of this Article"). We therefore conclude that the legislature intended to allow a particular murder to be used both as a predicate act and as a trigger for the additional penalty under section 33G-5(c). Consequently, Polk's additional sentence for the death of Snulligan was not error.

¶ 305                                    III. CONCLUSION

¶ 306   For the foregoing reasons, we remand this matter to allow for further inquiry into juror 40's allegations of racial bias during deliberations. Additionally, we vacate Polk's sentence for criminal drug conspiracy. Should a new trial prove unnecessary, Polk should be resentenced to a sentence of not less than 6 years but not more than 30 years for criminal drug conspiracy. We also exercise our authority under Illinois Supreme Court Rule 615(b) to retain jurisdiction over this matter. Ill. S. Ct. R. 615(b) (eff. Jan. 1, 1967); *People v. Garrett*, 139 Ill. 2d 189, 195 (1990).

¶ 307   Affirmed in part, vacated in part, and remanded; jurisdiction retained.

***People v. Polk*, 2024 IL App (1st) 181933**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 13-CR-13349; the Hon. Michael B. McHale, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Elizabeth A. Botti, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Iris G. Ferosie, and Sara McGann, Assistant State's Attorneys, of counsel), for the People. |